## COLGATE *v.* HARVEY, STATE TAX COMMISSIONER.

No. 8.   Argued October 14, 15, 1935.—Decided December 16, 1935.

---

[20] See, e. g., *Prentis* v. *Atlantic Coast Line,* 211 U. S. 210; *Keller* v. *Potomac Electric Co.,* 261 U. S. 428; *Ex parte Williams,* 277 U. S. 267, 271–2.

*Mr. Edward J. Dimock,* with whom *Mr. George L. Hunt* was on the brief, for appellant.

*Messrs. Guy M. Page* and *Seymour P. Edgerton,* with whom *Mr. Lawrence C. Jones,* Attorney General of Vermont, was on the brief, for appellee.

412

414

416

Mr. Justice Sutherland delivered the opinion of the Court.

The Vermont Income and Franchise Tax Act of 1931, Public Laws of Vermont, 1933, § 872 *et seq.* (the pertinent provisions of which are copied in the margin [1]), imposes

[1] " Chapter 39.

" Sec. 873. *Rate; Exemptions; Amount.*—A tax is hereby imposed upon every resident of the state, which tax shall be levied, collected and paid annually, with respect to:

" I. His net income as herein defined, after deducting the exemptions provided in this chapter, at the rate of two per cent; and

" II. To the income received by him on account of the ownership or use of or interest in any stock, bond, note, agreement or other interest bearing security at the rate of four per cent; but the words ' income received by him on account of the ownership or use of or interest in any stock, bond, note, agreement or other interest bearing security ' shall not include the following items which shall be exempt from taxation under this chapter:

"(a) Interest received on account of money loaned within this state, at a rate of interest not exceeding five per cent per annum evidenced by a promissory note, mortgage on real estate or a bond for a deed, including credits representing the purchase price, or any part thereof, of real estate within this state, sold or transferred, evidenced by a promissory note, mortgage or bond for a deed bearing a rate of interest not exceeding five per cent per annum;

"(e) Dividends on stocks of those corporations which are subject to taxation under chapter 40, but if a corporate franchise tax is not measured by the entire net income of such corporation, then a portion of the dividends paid by such corporation shall be taxable under this chapter, and such taxable portion shall be that proportion of the dividend as the income earned by the corporation from business done without the state of Vermont bears to the entire income of the corporation;

"(f) In case the income taxed in this section is derived wholly from ownership of or interest in any stock, bond, note or other interest bearing security, there shall be deducted from such income the following exemptions:

individual income taxes as follows: First, with respect to net income derived from salaries, wages, etc., denominated by the court below class A income, at the rate of 2%; second, with respect to income received on account of the ownership or use of or interest in any interest bearing security, denominated class B income, at the rate of 4%, excluding, however, from such income (a) interest re-

" 1. In case of a single individual a personal exemption of four hundred dollars;

" 2. In the case of the head of a family, or a married individual living with husband or wife, a personal exemption of eight hundred dollars; but if either a husband or wife shall receive any income other than that derived from the ownership of or interest in any stock, bond, note or other interest bearing security, then such personal exemption shall not be allowed. A husband and wife, living together, shall receive but one personal exemption of eight hundred dollars against their aggregate net income; and in case they make separate returns, the personal exemption of eight hundred dollars may be taken by either or divided between them. . . .

" Chapter 40.

" Sec. 887. *Rate.*—For the privilege of exercising its franchise in this state in a corporate or organized capacity, every domestic corporation, and for the privilege of doing business in this state every foreign corporation, liable to tax under this chapter shall annually pay to this state a franchise tax to be measured by its net income to be computed in the manner hereinafter provided at the rate of two per cent upon the basis of its net income as herein computed, for the next preceding fiscal or calendar year.

" Sec. 888. *Basis on business within the state.*—If the entire business of the corporation be transacted within the state, the tax imposed shall be based upon the entire net income of such corporation for such fiscal or calendar year. If the entire business of the corporation be not transacted within the state and its gross income derived from business done both within and without the state, the determination of its net income shall be based upon the business done within the state and for the purpose of computing such net income the commissioner shall adopt such recommendations and regulations for the allocation of net income as will fairly and justly reflect the net income of that portion of the business done within the state."

ceived on account of *money loaned within the state* at a rate of interest not exceeding 5% per annum, evidenced by a promissory note, mortgage, or bond for a deed bearing a like rate of interest; (b) dividends on stocks of corporations subject to taxation under §§ 887, 888 of the statute. If the income taxed is derived wholly from interest-bearing securities, there is allowed in the case of a single individual, a personal exemption of $400, and, in the case of a head of a family or of a married individual living with husband or wife, a personal exemption of $800. If, however, either husband or wife shall receive any income other than that derived from such securities, then the personal exemption is not allowed. A distinct and larger personal exemption is allowed in the case of net income derived from salaries, wages, etc. (§ 880)—namely, $1,000 in the case of a single individual, and $2,000 in the case of a head of a family or a married individual living with husband or wife.

Appellant is a resident of Vermont, married and living with his wife. During the taxable year in question, he received both class A and class B income; but his class A income, although large, was absorbed by allowable deductions, so that there was no net income from that source, and consequently nothing subject to taxation. His class B income amounted to a larger sum, part of which consisted of interest on notes, mortgages, etc., representing money loaned outside the State of Vermont at not exceeding 5% per annum, and another part from taxable dividends received from corporations other than Vermont corporations. Upon these two sums a tax was assessed against him at the rate of 4%. Under the statute he was allowed no personal exemption whatever.

The validity of the statute under the federal Constitution was properly challenged. The grounds of attack, so far as necessary to be stated, are as follows: (1) The act imposes a tax upon dividends earned outside the State of

Vermont, while exempting from the tax dividends earned within the state, thereby denying petitioner the equal protection of the laws in violation of the Fourteenth Amendment; (2) the act, in violation of the same clause, discriminates in favor of money loaned within the state as against money loaned outside the state; (3) the act arbitrarily denies appellant the $800 exemption while giving it to other persons whose situation differed from his only in that they had no income from business, and thereby denies appellant the equal protection of the laws guaranteed by the Fourteenth Amendment; and in each of these three particulars the act abridges the privileges and immunities of appellant as a citizen of the United States in contravention of the same amendment.[2]

The court below denied the contentions of appellant and sustained the validity of the act in every particular. 107 Vt. 28; 175 Atl. 352.

*First.* Does the imposition of a tax upon dividends earned outside the state, from which tax dividends earned within the state are exempt, constitute, under the Fourteenth Amendment, an allowable classification? The basis of the classification rests in the consideration that by §§ 887 and 888 a tax of 2%, measured by net income, is imposed upon every corporation for the privilege of exer-

---

[2] The further point is made that the discrimination in respect of dividends and interest upon loans is a regulation of interstate commerce and therefore void under the commerce clause of the federal Constitution. But we mention this latter claim only to reject it as without merit, since clearly a tax upon income is not an interference with interstate commerce simply because the income is derived from a source within another state; and, moreover, if there be any tendency to interfere with such commerce it is purely collateral and incidental. *Nathan* v. *Louisiana,* 8 How. 73, 82; *Williams* v. *Fears,* 179 U. S. 270, 276; *Diamond Glue Co.* v. *United States Glue Co.,* 187 U. S. 611, 616; *Anderson* v. *United States,* 171 U. S. 604, 616; *Engel* v. *O'Malley,* 219 U. S. 128, 138; *Moore* v. *N. Y. Cotton Exchange,* 270 U. S. 593, 604.

cising its franchise in the state and of doing business therein. If the entire business of the corporation be transacted within the state, the amount of the tax is fixed with regard to the entire net income. If the entire business be not so transacted, the net income is calculated with respect to that part of the business done within the state, to be allocated so as fairly and justly to reflect such net income. Dividends upon shares of corporations which are subjected to this tax are exempted from the income tax. In addition to the 2% franchise tax, all tangible corporate property lying within the state is subjected to a property tax. The evident aim of the classification, therefore, is to produce equality and not inequality; and, obviously, that aim will become effective in fact, to a greater or less extent, in the administration of the legislation.

The theory upon which the tax is laid upon dividends realized from out-of-state business while leaving dividends realized from domestic business untaxed, is that the 2% franchise tax, especially with the property tax added, has the effect of indirectly imposing a tax burden upon the latter measurably equivalent to that imposed directly upon the former. Thus, the tendency of the plan is to avoid taxing twice what is, in effect, the same thing. And conceding the power of the state to impose double or even multiple taxation, legislation which is calculated to avoid that undesirable result certainly cannot be condemned as arbitrary. Thus far, the question is settled in favor of the validity of the tax by prior decisions of this court. *Kidd* v. *Alabama,* 188 U. S. 730; *Darnell* v. *Indiana,* 226 U. S. 390, 398; *Traveller's Insurance Co.* v. *Connecticut,* 185 U. S. 364; *Watson* v. *State Comptroller,* 254 U. S. 122, 124–125; *Lawrence* v. *State Tax Comm'n,* 286 U. S. 276, 284. True, it well may be assumed that similar franchise and property taxes are imposed upon the outside corporations by other states; but the assumption is immaterial

to the issue here involved. It is enough that such taxes are not imposed by the State of Vermont. It was so decided in *Kidd* v. *Alabama, supra,* where Mr. Justice Holmes, speaking for the court, said (p. 732):

" The State of Alabama is not bound to make its laws harmonize in principle with those of other States. If property is untaxed by its laws, then for the purpose of its laws the property is not taxed at all." And see *Bacon* v. *Board of Tax Comm'rs,* 126 Mich. 22, 25–26; 85 N. W. 307.

Appellant urges that the franchise tax measured by the corporation's income is at the rate of 2%, while the tax on dividends is at the rate of 4%; and concludes that this results in putting a burden on dividends directly taxed twice as great as that imposed indirectly by the franchise tax. But it is obvious that, since the 4% tax is imposed only upon such part of the corporate net income as passes to the shareholders in the form of dividends, and the 2% tax is measured by the entire net income of the corporation, this conclusion is erroneous. Corporations do not, at least as a general rule, pay out their entire net income in dividends. Something is reserved for future contingencies; and it may well result that a tax of 2% measured by the entire net income of the corporation will roughly approximate the amount imposed by a 4% tax on that part of the net income paid out as dividends. There is nothing in the equality clause of the Constitution which requires that the two sums shall be mathematically equivalent. *Concordia Fire Ins. Co.* v. *Illinois,* 292 U. S. 535, 547. In *Klein* v. *Board of Supervisors,* 282 U. S. 19, this court sustained an act exempting corporate shares from taxation where 75% of the total property of the corporation was taxable in the state and the taxes thereon were paid. It was said that this was plainly a reasonable effort to do justice to all in view of the way other assessments were made.

It is impossible to say from the record before us that there is a greater disproportion here than was presented in the *Klein* case, or to conclude that the disproportion is so great as to stamp the classification as wholly arbitrary or capricious. Moreover, as a general thing, a corporation subject to the 2% franchise tax will pay also a tax upon property located within the state, with the effect of still further narrowing, if not altogether extinguishing, the difference.

This court has frequently said that absolute equality in taxation cannot be obtained and is not required under the Fourteenth Amendment. This, of course, is not to say that, because some degree of inequality from the nature of things must be permitted, gross inequality must also be allowed. The boundary between what is permissible and what is forbidden by the constitutional requirement has never been precisely fixed and is incapable of exact delimitation. In the great variety of cases which have arisen, decisions may seem to be difficult of reconcilement; but investigation will generally cause apparent conflicts to disappear when due weight is given to material circumstances which distinguish the cases. If the evident intent and general operation of the tax legislation are to adjust the burden with a fair and reasonable degree of equality, the constitutional requirement is satisfied. We think the provision now under consideration meets this test. *Cf. State Railroad Tax Cases,* 92 U. S. 575, 612; *Tappan* v. *Merchants' National Bank,* 19 Wall. 490, 504; *Merchants' Bank* v. *Pennsylvania,* 167 U. S. 461, 464.

*Second.* It is settled beyond the admissibility of further inquiry that the equal protection clause of the Fourteenth Amendment does not preclude the states from resorting to classification for the purposes of legislation. *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415. And " the power of the state to classify for purposes of taxation is

of wide range and flexibility . . ." *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32, 37. But the classification " must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." . *Royster Guano Co.* v. *Virginia, supra; Air-Way Corp.* v. *Day,* 266 U. S. 71, 85; *Schlesinger* v. *Wisconsin,* 270 U. S. 230, 240. The classification, in order to avoid the constitutional prohibition, must be founded upon pertinent and real differences, as distinguished from irrelevant and artificial ones. The test to be applied in such cases as the present one is—does the statute arbitrarily and without genuine reason impose a burden upon one group of taxpayers from which it exempts another group, both of them occupying substantially the same relation toward the subject matter of the legislation? " *Mere* difference is not enough . . ." *Louisville Gas Co.* v. *Coleman, supra; Frost* v. *Corporation Commission,* 278 U. S. 515, 522.

The question depends here upon whether the income taxed and the income exempted from taxation reasonably can be assigned to different classes. As the Supreme Court of Vermont itself has pointed out, in all such cases it must appear not only that a classification has been made, but that it is one based on some reasonable ground. *State* v. *Hoyt,* 71 Vt. 59, 64–66; 42 Atl. 973. The decision in that case held invalid a state statute the effect of which was to impose a tax upon sales of goods manufactured in the state, while leaving sales of goods manufactured in other states free from taxation. It was held that the classification could not be based on any difference in the goods, because there was none; nor on the fact that they were made in different states, for that bore no just and proper relation to the classification, but was purely arbitrary; nor on the difference of residence of the manufacturers, for the same reason. And clearly the view of the court was that

a like discrimination against the products of another state would have been open to the same objections.

Let us apply these principles to the statute creating the exemption now in question. Upon the face of the statute the classification is based upon a difference having no substantial or fair relation to the object of the act—which, so far as this question is concerned, simply is to secure revenue. The statute itself suggests no other public purpose which will be served by the exemption. The language creating the exemption is "(a) Interest received on account of money loaned within this state, at a rate of interest not exceeding five per cent per annum . . ." The naked and complete test afforded by the statute is that the money shall be loaned within the state. What is to be done with the money, whether it is to be invested in the state or elsewhere—indeed, whether it is to be devoted to any useful purpose—are matters having nothing to do with the imposition of the tax or the exemption therefrom. If the statute had provided that interest on account of money so loaned when invested in property having a situs within the state shall be free from the tax, a different question as to classification might be presented. In that event the actual wealth of the state would be increased, and in addition, and as a consequence, opportunity to obtain additional revenue through taxation would result. But this exempting provision, we repeat, contains neither this qualification nor any other. Its terms are positive and all-inclusive and will be fully satisfied whenever it appears that money has been loaned within the state. The Supreme Court of Vermont has not read into the statute a qualification that loans shall be deemed to be made within the state only if their proceeds be invested in the state. Obviously this court cannot so read the provision, for that would be to amend and not to construe it. We are unable to find in the provision any public purpose which can be subserved by

making the taxation of income from loans dependent merely upon the adventitious circumstance as to the place of making the loan.

It is suggested, however, that, aside from anything in the statute, money loaned within the state generally will be invested therein. But there is nothing in the record to indicate that this will result; and for aught this court can know judicially, there is no warrant for saying either that it will or will not result. All we can say is that money so loaned *may be* invested in Vermont, or *may be* invested in some other state—for example, in property having a situs in New York—or may not be invested at all. If there be circumstances which will justify the exemption of any income derived from money loaned within the state while taxing the income from that loaned outside, it is for the state legislature to point them out and limit the exemption accordingly. To import any such circumstances into the present situation is to indulge in pure speculation. Compare *Travis* v. *Yale & Towne Mfg. Co.*, 252 U. S. 60, 81.

To assume that some unnamed public interest exists, which will sustain the discrimination, does not help the matter here; because the assumption can rest only upon surmise, with nothing concrete or explicit appearing to support it or to indicate a legislative intent to relate the exemption to any public purpose or to anything else beyond the mere fact that the favored loans are effected within the state. In principle, the classification is quite as arbitrary as that dealt with by this court in *Louisville Gas Co.* v. *Coleman, supra,* pp. 38–39. If the exemption had been made to depend upon the *time* when the loan was made, instead of upon the *locality* where it was made—as, for example, a tax upon all income from loans except those made on Mondays—the arbitrary and capricious nature of the classification would scarcely be doubted, although a minute inspection of the field of

possibilities might persuade an anxious mind, bent on sustaining the tax at all events, to the view that in some far-fetched way a loan made on Monday would further some public purpose, other than that of revenue, which a loan made on another day of the week would not.

It is said that an exemption which may have for its aim the advancement of local interests can hardly be condemned under a Constitution which for a century has known a protective tariff. Considering the suggestion categorically, a pertinent answer to it is that while the general government may, for the benefit of national interests, exact impost duties which discriminate against foreign interests, one state, even for the advancement of its own interests, is not permitted to exact taxes discriminating against goods brought from a sister state. See, for example, *Welton* v. *Missouri,* 91 U. S. 275; cf. *Burnet* v. *Brooks,* 288 U. S. 378, 401, *et seq.*

But, assuming that the State of Vermont is benefited by the exemption, the complete answer is that appellant is a citizen of the United States; and, quite apart from the equal protection of the laws clause, the suggestion is effectively met and overcome, and the fallacy of other attempts to sustain the validity of the exemption here under review clearly demonstrated, by reference to the privileges and immunities clause of the Fourteenth Amendment. " For all the great purposes for which the Federal government was formed," this court has said, " we are one people, with one common country." *Crandall* v. *Nevada,* 6 Wall. 35, 48–49. As citizens of the United States we are members of a single great community consisting of all the states united and not of distinct communities consisting of the states severally. No citizen of the United States is an alien in any state of the Union; and the very status of national citizenship connotes equality of rights and privileges, so far as they flow from such citizenship, everywhere within the limits of the

United States. This fact is obvious and vital and no elaboration is required to establish it.

Section 2 of Article IV of the Constitution contains the provision, " The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The Fourteenth Amendment, § 1, provides:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . ."

Thus, the dual character of our citizenship is made plainly apparent. That is to say, a citizen of the United States is *ipso facto* and at the same time a citizen of the state in which he resides. And while the Fourteenth Amendment does not *create* a national citizenship, it has the effect of making that citizenship " paramount and dominant " instead of " derivative and dependent " upon state citizenship.[3] " In reviewing the subject," Chief Justice White said in the *Selective Draft Law Cases*, 245 U. S. 366, 377, 388–389, " we have hitherto considered it as it has been argued, from the point of view of the Constitution as it stood prior to the adoption of the Fourteenth Amendment. But to avoid all misapprehension we briefly direct attention to that [the Fourteenth] Amendment for the purpose of pointing out, as has been frequently done in the past, how completely it broadened the national scope of the Government under the Constitution by causing citizenship of the United States to be paramount and dominant instead of being subordinate

[3] In *United States* v. *Hall*, Case No. 15,282, 26 Fed. Cas. 79, 81, Judge Woods said: " By the original constitution citizenship in the United States was a consequence of citizenship in a state. By this clause this order of things is reversed. . . . and citizenship in a state is a result of citizenship in the United States."

and derivative, and therefore, operating as it does upon all the powers conferred by the Constitution, leaves no possible support for the contentions made, if their want of merit were otherwise not so clearly made manifest."

The result is that whatever latitude may be thought to exist in respect of state power under the Fourth Article, a state cannot, under the Fourteenth Amendment, abridge the privileges of a citizen of the United States, albeit he is at the same time a resident of the state which undertakes to do so. This is pointed out by Mr. Justice Bradley in the *Slaughter House Case,* 1 Woods 21, 28:

" The ' privileges and immunities ' secured by the original constitution were only such as each state gave to its own citizens. Each was prohibited from discriminating in favor of its own citizens and against the citizens of other states.

" But the fourteenth amendment prohibits any state from abridging the privileges or immunities of citizens of the United States, whether its own citizens or any others. It not merely requires equality of privileges but it demands that the privileges and immunities of all citizens shall be absolutely unabridged; unimpaired."

The same distinction is made by this court in *Bradwell* v. *State,* 16 Wall. 130, 138, where, speaking of the privileges and immunities provision of the Fourth Article, it was said:

" The protection designed by that clause, as has been repeatedly held, has no application to a citizen of the State whose laws are complained of. If the plaintiff was a citizen of the State of Illinois, that provision of the Constitution gave her no protection against its courts or its legislation." [4]

---

[4] This does not mean that a state has unlimited power by law to abridge the privileges of its own citizens. It only means that in such case we must look elsewhere than to the language of the privileges and immunities clause of the Fourth Article of the Constitution for the constitutional infirmity of the statute, if it have any.

But the court added that with respect to the Fourteenth Amendment " there are certain privileges and immunities which belong to a citizen of the United States as such; otherwise it would be nonsense for the Fourteenth Amendment to prohibit a State from abridging them, . . . We agree . . . that there are privileges and immunities belonging to citizens of the United States, in that relation and character, and that it is these and these alone which a State is forbidden to abridge." The governments of the United States and of each of the several states are distinct from one another. The rights of a citizen under one may be quite different from those which he has under the other. To each he owes an allegiance; and, in turn, he is entitled to the protection of each in respect of such rights as fall within its jurisdiction. *United States* v. *Cruikshank,* 92 U. S. 542, 549.

Under the Fourteenth Amendment, therefore, the simple inquiry is whether the privilege claimed is one which arises in virtue of national citizenship. If the privilege be of that character, no state can abridge it. No attempt has been made by the courts comprehensively to define or enumerate the privileges and immunities which the Fourteenth Amendment thus protects.[5] Among those privileges, however, undoubtedly is the right to pass freely from one State to another. *Crandall* v. *Nevada, supra; Williams* v. *Fears,* 179 U. S. 270, 274. And that privilege, obviously, is as immune from abridgement by the state from which the citizen departs as it is from abridgement by the state which he seeks to enter. This results from the essential character of national citizenship. Cf. *In re Kemmler,* 136 U. S. 436, 448; *Duncan* v. *Missouri,* 152 U. S. 377, 382; *In re Quarles and Butler,*

[5] For examples, however, see *Corfield* v. *Coryell,* 4 Wash. C. C. 371, 380, 381; *Slaughter-House Cases,* 16 Wall. 36, 79–80; *Twining* v. *New Jersey,* 211 U. S. 78, 97; *Ward* v. *Maryland,* 12 Wall. 418, 430; *Blake* v. *McClung,* 172 U. S. 239, 248, 252; *United States* v. *Wheeler,* 254 U. S. 281; *Paul* v. *Virginia,* 8 Wall. 168, 180.

158 U. S. 532, 536; *United States* v. *Cruikshank, supra,* at p. 552.

In the *Crandall* case, while the court at least gravely doubted whether a capitation tax imposed by the State of Nevada upon persons leaving the state by railroad or stagecoach violated the commerce clause (p. 43), it was distinctly held that the tax did affect the rights of citizens under the federal government so as to invalidate the act imposing the tax. The doubt as to the first point has been resolved in later cases against the power of the state (*Helson and Randolph* v. *Kentucky,* 279 U. S. 245, 251); but the ruling on the second point has never been doubted and was definitely approved in the *Slaughter-House Cases,* 16 Wall. 36, 79, and the right described in the *Crandall* case placed among the partially enumerated privileges and immunities " which owe their existence to the Federal government, its National character, its Constitution, or its laws." The opinions in both cases were delivered by the same eminent justice; and it is not without significance that while the first opinion was delivered before the adoption of the Fourteenth Amendment, the second one was delivered afterwards and with direct reference to the privileges and immunities clause of that amendment. The fact that we have since decided, and should now hold, that the Nevada act was in violation of the commerce clause, in no way detracts from the view that it also violated the privileges and immunities clause; but simply demonstrates that the same act of state legislation may contravene more than one provision of the federal Constitution.

The right of a citizen of the United States to engage in business, to transact any lawful business, or to make a lawful loan of money in any state other than that in which the citizen resides is a privilege equally attributable to his national citizenship. A state law prohibiting the exercise of any of these rights in another state would,

therefore, be invalid under the Fourteenth Amendment. The imposition by one state of a discriminating tax upon a citizen resident in another state for trading in the territory of the former has been held invalid. *Ward* v. *Maryland,* 12 Wall. 418, 430. And, of course, conversely, a tax of that description is likewise void if imposed by one state upon a resident citizen of the United States for trading or doing business in the territory of another state. And such a tax is not justified because the taxing state will thereby help its domestic business.

The purpose of the pertinent clause in the Fourth Article was to require each state to accord equality of treatment to the citizens of other states in respect of the privileges and immunities of state citizenship. It has always been so interpreted. One purpose and effect of the privileges and immunities clause of the Fourteenth Amendment, read in the light of this interpretation, was to bridge the gap left by that article so as also to safeguard citizens of the United States against any legislation of their own states having the effect of denying equality of treatment in respect of the exercise of their privileges of national citizenship in other states. A provision which thus extended and completed the shield of national protection between the citizen and hostile and discriminating state legislation cannot be lightly dismissed as a mere duplication, or of subordinate or no value, or as an almost-forgotten clause of the Constitution.

Reference has been made to numerous cases in which this court has rejected or ignored specific claims under the privileges and immunities clause; but since none of them relates to state legislation even remotely resembling the Vermont law here challenged, their collection and citation is without useful result, unless, as it seems to be thought, these numerous unsuccessful efforts to give the clause applications which fall outside its meaning show or tend to show that the clause itself has become a dead

letter. Such a conclusion is, of course, inadmissible; for as we have already said, referring to the *Bradwell* case, there *are* privileges and immunities which belong to a citizen of the United States *as such;* otherwise it would be nonsense to prohibit a state from abridging them. Some of these privileges and immunities we have already pointed out; others are enumerated in the cases cited under note 5.

To these illustrations we may add another, which here is peculiarly pertinent. The business of insurance has grown to vast proportions. Insurance companies issuing policies are found in every state; and the activities of the larger companies overflow state lines and extend into every part of the country. But insurance is not commerce; and the right of a citizen to take out a policy in one state, insuring property in another where he resides, cannot be protected under the commerce clause. National protection, when appropriate, must be found in the Fourteenth Amendment. It well cannot be doubted that a citizen of the United States, residing and having property in Vermont, exercises a privilege of national citizenship when he negotiates and takes out in another state a policy insuring that property, or takes out in another state a policy insuring his life. There may be very cogent reasons, resting in the strength of the company, terms of the policy, and otherwise, making it desirable that he should do so. And it well cannot be doubted that legislation of one state denying the privilege or taxing the transaction when it occurs in another state, while leaving the transaction wholly free from taxation when it takes place in the former state, would abridge that privilege of citizenship. It would be no answer to say that thereby the former state was building up her local insurance companies and adding to the wealth of the state. Nor is it any answer to say that the citizen may resort to other clauses of the Fourteenth Amendment which will afford

protection. The right of a citizen of the United States resident in one state to contract in another may be a liberty safeguarded by the due process of law clause, and at the same time, none the less, a privilege protected by the privileges and immunities clause of the Fourteenth Amendment. In such case he may invoke either or both. This seems to be recognized in *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589–592, where the court evidently thought that under circumstances not unlike those just suggested the words " liberty " and " privilege " were interchangeable terms.

It follows from what has been said that when a citizen of the United States residing in Vermont goes into New Hampshire, he does not enter foreign territory, but passes from one field into another field of the same national domain. When he trades, buys or sells, contracts or negotiates across the state line, when he loans money, or takes out insurance in New Hampshire—whether in doing so he remains in Vermont or not—he exercises rights of national citizenship which the law of neither state can abridge without coming into conflict with the supreme authority of the federal Constitution.

The statute, as here applied, says that if a citizen resident in Vermont loan his money at 5% or less in another state, he must pay a tax upon the income; but if he loan money in Vermont at the same rate, no tax whatever shall be imposed. The power to tax income here asserted by Vermont is, in the final analysis, the power to tax so heavily as to preclude loans outside the state altogether. It reasonably is not open to doubt that the discriminatory tax here imposed abridges the privilege of a citizen of the United States to loan his money and make contracts with respect thereto in any part of the United States.

The tax on dividends, already discussed and upheld, rests in a different situation. Although dividends from outside investments are taxed, and those from state in-

vestments in terms are exempt, they are, as already appears, in substance and effect treated alike—the one by a tax falling directly upon the income of the individual stockholders, and the other falling indirectly but no less definitely upon that income, in the form of a tax which is first imposed upon the corporation as a franchise tax measured by income, but the burden of which ultimately is borne by the stockholders. The effect is the same as though the tax were imposed generally upon corporate dividends without exception or discrimination. *Travellers' Insurance Co.* v. *Connecticut,* 185 U. S. 364, 369 *et seq.* The same would be true of the tax on income from loans, if it had been imposed in respect of all loans wherever made or if there had been some form of equalizing tax which would have compensated for the burden cast upon loans made in other states. But such is not the case. Income from loans made outside the state is taxed directly, while income from loans made within the state is not taxed directly or in any indirect way so as to equalize the burden. *Woodruff* v. *Parham,* 8 Wall. 123, 140, dealt with a sales tax imposed upon all sales, whether made by a citizen of the state where the tax was imposed or a citizen of another state; and whether the goods sold were the product of the state enacting the law or of some other state. This court upheld the tax upon the ground that it did not discriminate against the products of other states or affect the privileges or immunities of their citizens; but the court clearly stated that if it had done so it would be an infringement of the provisions of the Constitution relating to those subjects. The principle of that case is applicable here and has the effect of sustaining the tax in respect of dividends and condemning the tax in respect of loans. Compare *Travis* v. *Yale & Towne Mfg. Co., supra.*

*Third.* The statute, so far as it applies to appellant, provides that if the income taxed be derived wholly from ownership of or interest in interest-bearing securities, there shall be allowed an exemption of $800. If the in-

come be derived from other enumerated sources, an exemption is allowed of $2,000 against the " aggregate net income."

It is manifest that if the legislation had provided that where the taxpayer shall have income from both of these general sources he shall not be entitled to both exemptions, the provision would have been open to no constitutional objection. Such legislation might properly permit him, in that contingency, to select which of the exemptions he will take; or, on the other hand, might properly specify which of the two exemptions shall be accorded him. In effect, though not in terms, it is the latter alternative which the statute adopts. In terms, the statute provides that if the taxpayer receive any income other than that derived from interest-bearing securities, the personal exemption applicable to the latter class of income shall not be allowed. But the right to the $2,000 exemption allowed in respect of class A income remains unaffected. The taxpayer who receives both classes of income, while thus compelled to forego the smaller exemption, is accorded the larger one; and it is impossible reasonably to find in this situation anything arbitrary or capricious. It is true that during the taxable year in question appellant had no net income because his gross income derived from salaries, etc., amounting to about $70,000, was entirely absorbed by allowable deductions; but this was an incident of the particular year in question and might never happen again. He failed to obtain the advantage of the exemption not because of any hostile statutory intent or hostile enforcement of the tax, but because of the collateral circumstance, peculiar, perhaps, to him alone and to the taxable year in question, that his entire gross income was absorbed by deductions, allowed by the statute as a matter of grace as is the exemption itself, so that nothing remained from which the amount of the exemption or any part of it could be subtracted.

The question of equal protection must be decided in respect of the general classification rather than by the chance incidence of the tax in particular instances or with respect to particular taxpayers. "And inequalities that result not from hostile discrimination, but occasionally and incidentally in the application of a system that is not arbitrary in its classification, are not sufficient to defeat the law." *Maxwell* v. *Bugbee,* 250 U. S. 525, 543. " The operation of a general rule will seldom be the same for every one. If the accidents of trade lead to inequality or hardship, the consequences must be accepted as inherent in government by law instead of government by · edict." *Fox* v. *Standard Oil Co.,* 294 U. S. 87, 102. Cf. *Packard* v. *Banton,* 264 U. S. 140, 145; *Gant* v. *Oklahoma City,* 289 U. S. 98, 102; *Storaasli* v. *Minnesota,* 283 U. S. 57, 62.

The general classification—namely, that the right to a partial exemption from a tax upon one class of income will depend upon whether the taxpayer is in receipt of income of another class with respect to which a different exemption applies—does not seem to us to be open to the objection that it is arbitrary or capricious, simply because, like any other general rule of taxation, its administration may involve incidental instances of inequality.

We conclude that the taxing act is valid in respect of the first and third points which we have discussed, but · invalid in respect of the second.

> *Reversed and remanded for further proceedings not inconsistent with the foregoing opinion.*

MR. JUSTICE STONE, dissenting.

I think that the exemption, from the tax, of net income from money loaned within the state at not more than 5%, like the exemption of income from dividends of

corporations earned within the state, does not deny equal protection or infringe any privilege or immunity of citizens of the United States, and that the judgment should be affirmed in its entirety. Unless the constitutional validity of the exemptions is to turn upon the ground that we approve laws enacted to avoid taxing the same economic interest twice, but disapprove those to encourage residents to invest their funds at home, it would seem that the considerations which have led to upholding the one exemption would not admit of condemning the other. See *Southwestern Oil Co.* v. *Texas*, 217 U. S. 114, 127.

1. It is not denied that the effect of both exemptions is to place a burden on income derived from sources or investments made without the state which they do not place on income derived from like sources or investments made within it. But that affords no ground for saying that either is invalid. The equal protection clause does not forbid inequalities in state taxation. A state may select the objects to be taxed and selection, which is but the converse of exemption, involves the imposition of a tax burden on some which is not placed on others. As this Court has repeatedly held, inequalities resulting from the singling out of one particular class for taxation or exemption, regardless of the reason for the choice, or even if there is no discernible reason, are not to be pronounced invalid where there is no clear indication that the purpose or effect is a hostile or oppressive discrimination against particular persons or classes. *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89; *Board of Education* v. *Illinois,* 203 U. S. 553; *Beers* v. *Glynn,* 211 U. S. 477; *Southwestern Oil Co.* v. *Texas, supra; Quong Wing* v. *Kirkendall,* 223 U. S. 59; *Citizens Telephone Co.* v. *Fuller,* 229 U. S. 322; *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245; *Lawrence* v. *State Tax Comm'n,* 286 U. S. 276; *Concordia Fire Insurance Co.* v. *Illinois,* 292 U. S. 535.

The end sought by the classification is of significance in passing upon the constitutionality of the tax only insofar as it serves to show that the discrimination is not invidious. If it appears or may fairly be assumed that it is for the purpose of promoting a permissible public aim, it cannot be condemned because one class must pay a tax which another does not. Where the public interest is served one business may be left untaxed and another taxed, in order to promote the one, *American Sugar Refining Co.* v. *Louisiana, supra; Heisler* v. *Thomas Colliery Co., supra; Aero Mayflower Transit Co.* v. *Georgia Commission,* 295 U. S. 285, or to restrict or suppress the other, *Magnano Co.* v. *Hamilton,* 292 U. S. 40; *Fox* v. *Standard Oil Co.,* 294 U. S. 87; *Quong Wing* v. *Kirkendall, supra; Singer Sewing Machine Co.* v. *Brickell,* 233 U. S. 304; *Alaska Fish Co.* v. *Smith,* 255 U. S. 44, 48. But it is not necessary to go so far to support the present exemption. There is no serious contention that its purpose or effect is to suppress the lending of money without the state or to injure appellant or his fellow residents of Vermont who may prefer to invest their funds elsewhere. Nor can it be said that the exemption was not granted in furtherance of a permissible state policy, which was the legislative objective rather than an invidious discrimination against appellant and others similarly situated.

It seems to be conceded that if the statute had placed upon the tax gatherers the burden of ascertaining whether money loaned within the state is invested in property there, and had limited the exemption to money so loaned and invested, the tax would be sustained because of the benefit which would result from the increase of wealth in the state and the enlarged opportunity to obtain additional revenue. The attack is thus narrowed to the single objection that there are exempted loans, some of which, although made within the state, are or may be withdrawn and used elsewhere. It is assumed that money thus loaned

and withdrawn can be of no possible benefit to the state, and it is declared that since such transactions may occur the Court cannot determine whether the exemption will have any beneficent effect and that it is therefore invalid.

But there are benefits other than the increase of its taxable wealth which a state is at liberty to stimulate by its taxing policy, and exemptions have been sustained on the broader ground that they foster some form of domestic industry. *New York* v. *Roberts,* 171 U. S. 658; *Magnano Co.* v. *Hamilton, supra; Fox* v. *Standard Oil Co., supra; Aero·Mayflower Transit Co.* v. *Georgia Commission, supra.* If Vermont chooses to encourage, by tax exemption, loans at favorable rates of interest within the state, because it believes that local interests will be benefited, it can hardly be said for that reason to be contravening a constitution that has known a protective tariff for more than one hundred years. See *Alaska Fish Co.* v. *Smith, supra,* 48; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 347. It is true that a state may not lay taxes on imports or burden interstate commerce, *Welton* v. *Missouri,* 91 U. S. 275, but it is too late for this Court to declare that a state may not favor domestic interests by granting exemptions in the exercise of its taxing power.

It is not for us to say that the Vermont legislature was unmindful of these broader advantages, or to declare that the presence within the state of investment funds offered at 5% or less to borrowers there, including those who are carrying on the business and industry of the state, is not beneficial; or that if any loans made within the state are used elsewhere they are or ever would be more than negligible in amount; or if they were that they could not have a favorable effect on interest rates within the state, which is a matter of state concern. When the Vermont legislature adopted the present exemption, it had before it the reports of two committees specially appointed to inves-

tigate the tax system of the state, which clearly indicate their judgment, based on a study of conditions in the state, that the existing system was driving investment capital from the state or into secured and non-commercial loans, and that a tax exemption embracing both secured and commercial loans would tend to increase the supply of investment capital for both and to reduce interest rates in the state.[1] This Court has no basis for saying that those committees were wrong and no authority to say it. The state supreme court has stated in the present case that the legislature did have in mind these broader advantages, for it rested its decision on the ground that the exemption was made "in the interest of thrift and state development" and "for the assistance of the agricultural and industrial interests of the state."

If in the face of so much which is persuasive of the legitimate purpose and effect of this legislation, we are to declare that we cannot say whether the benefits intended either will or will not result, it does not follow that the Vermont legislature is similarly uninformed. We must assume that it is not, unless we are to discard the salutary principle of decision, that, out of a decent respect to an independent branch of the government, legislative acts must be taken to be based on facts which support their constitutional validity unless the contrary reasonably ap-

---

[1] The committee appointed in 1900 by the Governor of Vermont to investigate double taxation and to recommend measures for its relief found that the existing taxing system was driving capital from the state or into tax exempt savings banks, and suggested an exemption of loans secured by property returned for taxation in the state. Double Taxation in Vermont; Report of Special Committee Appointed to Report a Measure for its Relief to the Legislature of 1900, pp. 4, 15. In 1908 a similar committee recognized the same evils but did not favor the exemption of secured loans alone, because it would increase interest rates on unsecured loans and cause a dearth of commercial credits. Vermont—Commission on Taxation—Report 1908, pp. 43 ff,

pears. This Court, it is true, has held discriminations invalid where, upon the facts disclosed by the record or within the range of judicial notice, it has felt able to say that there could be no state of facts which could rationally support them. *Royster Guano Co.* v. *Virginia,* 253 U. S. 412; *Heiner* v. *Donnan,* 285 U. S. 312; *Louisville Gas & Electric Co.* v. *Coleman,* 277 U. S. 32; *Liggett Co.* v. *Lee,* 288 U. S. 517. But in no case has it rendered such a judgment where it has declared that it is unable to say that consequences which would justify the discrimination will not result. *Erb* v. *Morasch,* 177 U. S. 584, 586; *Middleton* v. *Texas Power & Light Co.,* 249 U. S. 152, 158; *Stebbins* v. *Riley,* 268 U. S. 137, 143; *Swiss Oil Corp.* v. *Shanks,* 273 U. S. 407, 413, 414; *Fort Smith Light & Traction Co.* v. *Paving District No. 16,* 274 U. S. 387, 391, 392; *Clarke* v. *Deckebach,* 274 U. S. 392; *Silver* v. *Silver,* 280 U. S. 117, 123; *O'Gorman & Young, Inc.* v. *Hartford Fire Ins. Co.,* 282 U. S. 251, 257, 258; *Board of Tax Commissioners* v. *Jackson,* 283 U. S. 527, 537–541; *Hardware Dealers Mut. Fire Ins. Co.* v. *Glidden Co.,* 284 U. S. 151, 158; *Boston & Maine R. R.* v. *Armburg,* 285 U. S. 234, 240; *Lawrence* v. *State Tax Comm'n, supra,* 283; *Concordia Fire Insurance Co.* v. *Illinois, supra,* 547, 548; *Metropolitan Casualty Insurance Co.* v. *Brownell,* 292 U. S. 620; *Fox* v. *Standard Oil Co., supra.* Unless, as we profess not to do, *Standard Oil Co.* v. *City of Marysville,* 279 U. S. 582, we are to sit as a super-legislature, or as triers of the facts on which a legislature is to say what shall and what shall not be taxed, we are not free to say that the exemption will not induce residents to offer to lend their funds within the state and at lower interest rates than they otherwise would, or that opportunities thus afforded will not be availed of by borrowers requiring funds for carrying on the commerce and industry of the state.

Even if we are to assume, in the absence of any actual knowledge, that money loaned in the state at favorable

rates would not benefit it if used elsewhere, and further that in fact some money is so loaned and used, there is no discernible reason why those circumstances should be deemed to invalidate the tax and none is stated by the Court. It is irrelevant that the state, which has selected domestic loans for exemption in furtherance of a state policy, has not excluded from the exemption every transaction which conceivably might not advance its purpose. Whether the legislative object is completely achieved is of no concern to this Court, once it appears that the exemption is made for a permissible end and bears some reasonable relation to that end. Purpose or motive of the selection of the objects of taxation and exemption is material only so far as it is needful to ascertain whether the discrimination is invidious. If the choice is not condemned for that reason, it has never been held that an exemption must fail because it may benefit some who do not advance the legislative purpose. A classification for a permissible end is not to be condemned because it operates to prohibit transactions in themselves harmless, or fails to reach others which are harmful. *Powell* v. *Pennsylvania,* 127 U. S. 678; *Purity Extract Co.* v. *Lynch,* 226 U. S. 192; *Hebe Co.* v. *Shaw,* 248 U. S. 297; *Jacob Ruppert, Inc.* v. *Caffey,* 251 U. S. 264; *Miller* v. *Wilson,* 236 U. S. 373; *Hawley* v. *Walker,* 232 U. S. 718.

All taxes must of necessity be levied by general rules capable of practical administration. In drawing the line between the taxed and the untaxed the equal protection clause does not command the impossible or the impractical. Unless the line which the state draws is so wide of the mark as palpably to have no reasonable relation to the legitimate end, it is not for the judicial power to reject it and say that another must be substituted. *Citizens' Telephone Co.* v. *Fuller, supra,* 329; *Miller* v. *Wilson,* 236 U. S. 373, 384; *Clark* v. *Titusville,* 184 U. S. 329, 331; *Metropolis Theatre Co.* v. *Chicago,* 228 U. S.

61, 69, 70; see also *Salomon* v. *Tax Commission*, 278 U. S. 484; *McCray* v. *United States*, 195 U. S. 27; *Quong Wing* v. *Kirkendall, supra; Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237.

As the purpose of the exemption appears to be to encourage the lending of money within Vermont by its residents, at low rates of interest, and as it appears reasonably calculated to have that effect, and as we cannot say that such loans will not be of benefit to the state by tending to establish the interest rate at 5% or less, and by stimulating loans to borrowers for the purpose of carrying on business and industry within the state, the conclusion seems inescapable that the equal protection clause does not forbid it.

2. Feeble indeed is an attack on a statute as denying equal protection which can gain any support from the almost forgotten privileges and immunities clause of the Fourteenth Amendment. The notion that that clause could have application to any but the privileges and immunities peculiar to citizenship of the United States, as distinguished from those of citizens of states, has long since been rejected. *Slaughter-House Cases,* 16 Wall. 36. It created no new privileges and immunities of United States citizenship, *Bartemeyer* v. *Iowa,* 18 Wall. 129, 133, and, as they are derived exclusively from the Constitution and laws enacted under it, the states were powerless to abridge them before the adoption of the Fourteenth Amendment as well as after. See *Crandall* v. *Nevada,* 6 Wall. 35.

Before the Amendment the privilege of passing from state to state for the purpose of approaching the seat of the national government, of transacting business with it, and of gaining access to its courts, its public offices and its ports, was declared in *Crandall* v. *Nevada, supra,* 44, to be a right of national citizenship which could be exercised independently of the will of the state. Upon this

ground was placed the decision in that case that a state capitation tax on passengers transported out of the state by railroad or stage coach infringed the Constitution. No one could doubt that if the decision had been made at any time after *Railroad Co.* v. *Maryland,* 21 Wall. 456, 472 (1874), and until the present moment, it would have been rested on the commerce clause. This Court has many times pointed out that movements of persons across state boundaries are a part of interstate commerce, subject to the regulation and entitled to the protection of the national government under the commerce clause. *Caminetti* v. *United States,* 242 U. S. 470; *Hoke* v. *United States,* 227 U. S. 308; *Mayor of Vidalia* v. *McNeely,* 274 U. S. 676; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196; cf. *Passenger Cases,* 7 How. 283. And it has specifically pointed out that *Crandall* v. *Nevada, supra,* is overruled so far as it referred the protection of such commerce to the privileges and immunities clause rather than to the commerce clause. *Helson and Randolph* v. *Kentucky,* 279 U. S. 245, 251.

The privileges and immunities clause has consistently been construed as protecting only interests, growing out of the relationship between the citizen and the national government, created by the Constitution and federal laws. *In re Kemmler,* 136 U. S. 436, 448; *McPherson* v. *Blacker,* 146 U. S. 1, 38; *Giozza* v. *Tiernan,* 148 U. S. 657, 661; *Duncan* v. *Missouri,* 152 U. S. 377, 382. Appeals to this Court to extend the clause beyond these limitations have uniformly been rejected, and even those basic privileges and immunities secured against federal infringement by the first eight amendments have been held not to be protected from state action by the privileges and immunities clause. *Walker* v. *Sauvinet,* 92 U. S. 90; *Presser* v. *Illinois,* 116 U. S. 252; *O'Neil* v. *Vermont,* 144 U. S. 323; *Maxwell* v. *Dow,* 176 U. S. 581; *Twining* v. *New Jersey,* 211 U. S. 78; cf. *Hurtado* v. *California,* 110 U. S. 516; *West* v. *Lou-*

*isiana,* 194 U. S. 258. The protection and control of intercourse between the states, not carried on in pursuance of the relationship between the citizen and the national government, has been left to the interstate commerce clause, to the due process and equal protection clauses of the Fourteenth Amendment, and to Art. IV, § 2, guaranteeing to the citizens of each state the privileges and immunities of citizens in the several states. See *Williams* v. *Fears,* 179 U. S. 270. In no case since the adoption of the Fourteenth Amendment has the privileges and immunities clause been held to afford any protection to movements of persons across state lines or other form of interstate transaction.

The reason for this reluctance to enlarge the scope of the clause has been well understood since the decision of the *Slaughter-House Cases, supra.* If its restraint upon state action were extended more than is needful to protect relationships between the citizen and the national government, and it did more than duplicate the protection of liberty and property secured to persons and citizens by the other provisions of the Constitution, it would enlarge judicial control of state action and multiply restrictions upon it to an extent difficult to define, but sufficient to cause serious apprehension for the rightful independence of local government. That was the issue fought out in the *Slaughter-House Cases, supra,* with the decision against the enlargement. Since the adoption of the Fourteenth Amendment at least forty-four cases [2] have been

[2] *Slaughter-House Cases,* 16 Wall. 36; *Bradwell* v. *State,* 16 Wall. 130; *Bartemeyer* v. *Iowa,* 18 Wall. 129; *Minor* v. *Happersett,* 21 Wall. 162; *Walker* v. *Sauvinet,* 92 U. S. 90; *Kirtland* v. *Hotchkiss,* 100 U. S. 491; *Presser* v. *Illinois,* 116 U. S. 252; *Mahon* v. *Justice,* 127 U. S. 700; *In re Kemmler,* 136 U. S. 436; *Crowley* v. *Christensen,* 137 U. S. 86; *McElvaine* v. *Brush,* 142 U. S. 155; *McPherson* v. *Blacker,* 146 U. S. 1; *Giozza* v. *Tiernan,* 148 U. S. 657; *Duncan* v. *Missouri,* 152 U. S. 377; *Miller* v. *Texas,* 153 U. S. 535; *In re Lockwood,* 154 U. S. 116; *Iowa Central Ry.* v. *Iowa,* 160 U. S. 389; *Plessy*

.brought to this Court in which state statutes have been assailed as infringements of the privileges and immunities clause. Until today none has held that state legislation infringed that clause.

If its sweep were now to be broadened to include protection of every transaction across state lines, regardless of its connection with any relationship between the citizen and the national government, a step would be taken, the gravity of which might well give us concern. But it is necessary to go much further before the present tax can be condemned. If protection of the freedom of the citizen to pass from state to state were the object of our solicitude, that privilege is adequately protected by the commerce clause, even though the purpose of his going be to effect insurance or transact any other kind of business which is in itself not commerce. But protection of the citizen's freedom of movement, whether by the privileges and immunities clause or by the commerce clause, will afford appellant no relief from the present tax. The record does not show that he was ever outside the State of Vermont and for aught that appears he acquired his extra-state investments, which are in the form of negoti-

---

v. *Ferguson*, 163 U. S. 537; *Orient Insurance Co.* v. *Daggs*, 172 U. S. 557; *Cumming* v. *Board of Education*, 175 U. S. 528; *Maxwell* v. *Dow*, 176 U, S. 581; *Williams* v. *Fears*, 179 U. S. 270; *Orr* v. *Gilman*, 183 U. S. 278; *Cox* v. *Texas*, 202 U. S. 446; *Board of Education* v. *Illinois*, 203 U. S. 553; *Ballard* v. *Hunter*, 204 U. S. 241; *Western Turf Assn.* v. *Greenberg*, 204 U. S. 359; *Halter* v. *Nebraska*, 205 U. S. 34; *Wilmington Star Mining Co.* v. *Fulton*, 205 U. S. 60, 73; *Twining* v. *New Jersey*, 211 U. S. 78; *Western Union* v. *Commercial Milling Co.*, 218 U. S. 406; *Missouri Pacific Ry. Co.* v. *Castle*, 224 U. S. 541; *Graham* v. *West Virginia*, 224 U. S. 616; *Selover, Bates & Co.* v. *Walsh*, 226 U. S. 112; *Rosenthal* v. *New York*, 226 U. S. 260; *Waugh* v. *Board of Trustees*, 237 U. S. 589; *Porter* v. *Wilson*, 239 U. S. 170; *Crane* v. *Campbell*, 245 U. S. 304; *Armour & Co.* v. *Virginia*, 246 U. S. 1; *Omaechevarria* v. *Idaho*, 246 U. S. 343; *Maxwell* v. *Bugbee*, 250 U. S. 525; *Ownbey* v. *Morgan*, 256 U. S. 94; *Prudential Ins. Co.* v. *Cheek*, 259 U. S. 530; *Hamilton* v. *Regents*, 293 U. S. 245.

able corporate securities, by gift or purchase in Vermont. Nor does it appear that the physical securities or payments of income of which appellant has had the benefit have crossed state lines. He can be saved from the tax only by the extension of the immunity to his income merely because the property from which it has been derived, or the corporation paying it, is located in another state.

Such is the contention now made: that the privilege of acquiring, owning and receiving income from investments without the state is a privilege of federal citizenship. And the suggestion is that the privilege is infringed by taxing this income just as the commerce clause is infringed by state taxation burdening the privilege of carrying on commerce across state lines. In any case the privileges and immunities clause is said to be infringed by taxing this income at a different rate than income from investments made within the state.

The novel application thus given to the clause, and the arguments used to support it, leave one in doubt whether it is thought to preclude all differences of taxation of the two classes of income, or only to forbid such inequality as is in some sense arbitrary and unreasonable. If the former, the clause becomes an inexhaustible source of immunities, incalculable in their benefit to taxpayers and in their harm to local government, by imposing on the states the heavy burden of an exact equality of taxation wherever transactions across state lines may be involved. If the latter, it would seem to add nothing to the guarantee of the equal protection clause, which extends to all " persons," including citizens of the United States. In that case discourse upon the privileges and immunities clause would appear to be a gratuitous labor of supererogation.

If the privilege of making investments without the state is one protected by the privileges and immunities clause

and a tax upon the income derived from them is analogous to a tax upon the privilege of carrying on interstate commerce, we must not only accept the view that the privilege is infringed by the present tax, but it would follow that any taxation of the income is forbidden. The answer is, of course, that a state tax on net income derived from interstate commerce has never been regarded as a burden on commerce or as an infringement of the commerce clause. See *United States Glue Co.* v. *Oak Creek,* 247 U. S. 321; *Shaffer* v. *Carter,* 252 U. S. 37; cf. *Peck & Co.* v. *Lowe,* 247 U. S. 165; *Wagner* v. *Covington,* 251 U. S. 95. Far less could it be thought that a tax on property, or income from it, is an interference with commerce because the property had at some time been or might some time become the subject of such commerce. Cf. *Heisler* v. *Thomas Colliery Co., supra.* In applying the privileges and immunities clause, as now interpreted, no ground is suggested, or well could be, for regarding a tax on income from investments without the state as infringing the privilege of carrying on interstate transactions, any more than a tax on net income derived from interstate commerce or from property which had at some time moved in interstate commerce infringes the commerce clause.

The contention that a state tax indirectly affecting transactions carried on across state lines, not forbidden by the commerce clause or by Art. IV, § 2, can be condemned under the privileges and immunities clause, was definitely rejected by this Court in *Williams* v. *Fears, supra.* There a state occupation tax upon those engaged in hiring laborers for employment outside the state was held not to infringe the privileges and immunities clause or the equal protection clause.

So far as the objection is addressed to bare inequality of taxation affecting interstate transactions, if valid, it must be accepted as compelling equality of taxation by

the state of the citizen's residence and as well by the state into which the transaction extends. More than this, since the exercise of the privilege involves both states, it would seem to be infringed not only by an unequal tax imposed by either, but by any tax imposed at the normal rate by both.

Starting with the dubious assumption that the protection of every movement of the citizen interstate, an acknowledged subject of the commerce clause, is independently a subject of the privileges and immunities clause, the protection afforded by the latter is expanded until it affords a refuge to the citizen from taxation which has no necessary relation to his movements interstate and is in fact not shown to impose any restraint upon them. A tax immunity created avowedly for the protection of the citizen's privilege of movement from state to state is thus pressed far beyond the requirements of the interest put forward to justify it, and to a point which has never been thought needful or even desirable for the protection of the commerce of the nation. It is a transition effected only by ignoring the decision of this Court in *Williams* v. *Fears, supra.*

If mere difference in taxation is made the test of infringement, the iron rule of equality of taxation which the equal protection and due process clauses have failed to impose, see *Bell's Gap R. Co. v. Pennsylvania, supra,* 237, is the first fruit of this expansion of the protection of the privileges and immunities clause. To gain the benefits of its shelter the citizen has only to acquire, by a transaction wholly intrastate, an investment outside his state. I can find in the language and history of the privileges and immunities clause no warrant for such a restriction upon local government and policy. Citizens of the United States are given no privilege not to pay taxes. It would seem that a subordination of state taxing power to the

interests of the individual, of such debatable wisdom, could be justified only by a pointed command of the Constitution of plain import.

If we turn from the reasoning by which this application of the privileges and immunities clause to state taxation is supported to the decision now actually made, it seems that the clause is thought to prohibit only those inequalities in taxation which are considered to be arbitrary and unreasonable. The exemption of dividends derived from corporate business carried on within the state, and the taxation of similar dividends from without the state, is held not to be an infringement of the clause. Exemption of income from investments in property within the state and taxation of like income from without the state is thought to be valid. But the privileges and immunities clause, it is declared, forbids any difference in the taxation of income from investment made within the state and income from investment made without, a conclusion which can only be attributed to the belief that this discrimination, as distinguished from the others, is arbitrary and unreasonable.

We are thus returned to the point of beginning, to a discussion of the question whether the exemption in the present tax is so unreasonable, so without support of a permissible state policy, as to infringe constitutional limitations. If the exemption does not merit condemnation as a denial of the equal protection which the Fourteenth Amendment extends to every person, nothing can be added to the vehemence or effectiveness of the denunciation by invoking the command of the privileges and immunities clause.

The judgment should be affirmed.

Mr. Justice Brandeis and Mr. Justice Cardozo concur in this opinion.