James SHARP, Jr., Appellant,

v.

Mrs. May LUCKY, Registrar of Voters, Ouachita Parish, Appellee.

No. 16687.

United States Court of Appeals
Fifth Circuit.

Feb. 25, 1958.

Dissenting Opinion March 4, 1958.

Rehearing Denied March 28, 1958.

James Sharp, Jr., Monroe, La., for appellant.

Fred Fudickar, Jr., Albin P. Lassiter, Monroe, La., George M. Ponder, first Asst. Atty. Gen., Jack P. F. Gremillion, Atty. Gen., for appellee.

Before BORAH, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from an order dismissing appellant's suit for violation of his civil rights for want of jurisdiction and for failure to state a claim upon which relief can be granted.

The complaint alleges that Sharp, a Negro lawyer, went to the office of defendant, Mrs. Lucky, Registrar of Voters of Ouachita Parish, Louisiana, on legal business for his client, another Negro, Willie L. Tillman, who had been notified that his voter's registration was challenged; that Mrs. Lucky told him that only white persons were waited on in her office, and that her assistant took care of all colored people in the police jury room; that Mrs. Lucky "refused to let plaintiff and his clients [sic] see his card and comply with her letter in her office soley [sic] because they are Negroes, and that she is at present segregating Negroes in office soley [sic] on the basis of their race"; that because of these acts of appellee, appellant's *client* has lost his status as a voter in Ouachita Parish, all because plaintiff was prevented from representing his client solely because of his race, for which he seeks damages;

that "defendant has violated the 14th and 15th Amendments of the Constitution of the United States in the arbitrary, capricious and discriminatory manner as hereinabove set out; that plaintiff and persons of the class they [sic] represent have been and are being refused the right to registrar [sic] and vote and/or answer correspondence from the registrar in her office solely because of their color and race." The complaint alleged that it was a class action, [1] and sought the following relief:

"2. That after all legal delays and due proceedings had, that this Court render judgment herein in favor of plaintiff and against the defendant decreeing that the defendant has refused to permit plaintiff and the class he represent [sic] to register vote and answer, reply or adjust matters pertaining thereto in her office solely because of their color and race in violation of the Fourteenth (14th) and Fifteenth (15th) Amendments of the Constitution of the United States.

"3. That the defendant and her successors in office be ordered to cease, desist and refrain from arbitrarily and capriciously discriminating and segregating against plaintiff and any members of the class he represent [sic] and Negroes generally in her office solely because of their color and race.

"4. That a permanent injunction issue herein, after proper hearing, enjoining the defendant and her successors in office from segregating and discriminating and denying to Negroes the use of her office because of their color and race.

\*    \*    \*    \*    \*    \*

1. Paragraph 3 of the Complaint follows:
"That this is a class action authorized by rule 23(a) of the rules of Civil Procedure [28 U.S.C.A.] for the District Courts of the United States. The rights involved are of common and general interest to the members of the class represented by plaintiff, namely, Negro citizens of the State of Louisiana, similarly situated, who are fully qualified

electors under the constitution and laws of the United States and of the State of Louisiana. That members of this class are so numerous as to make it impracticable to bring them all before the Court and for this reason plaintiff prosecutes this action in his own behalf and in behalf of the class without specifically naming them in this petition."

"6. That plaintiff herein have judgment against the defendant in the sum of Twenty-Fice [sic] Thousand and no/100 ($25,000.00) Dollars, damages.

"7. That this Court will allow plaintiff his cost herein, and such further, other, additional relief as may appear to the Court to be just and equitable."

The case was heard below on the defendant's motion to dismiss, no answer having been made on the merits. The grounds urged for dismissal were: (1) That the court lacked jurisdiction over the subject matter; (2) The court lacked jurisdiction of the person; (3) The complaint failed to state a claim on which relief could be granted.

The suit must stand, if at all, upon a federally created right, for there is no diversity of citizenship. The applicable statutes, generally known as the Civil Rights Statutes, are 42 U.S.C.A. § 1981,[2] § 1983,[3] and 28 U.S.C.A. § 1343.[4] The applicable provision of the Constitution is § 1 of the Fourteenth Amendment.

■ The trial court, construing the complaint simply as a suit for damages for the interference with plaintiff's right to practice law, determined that the prevention of such interference by state officials was not a violation of a civil right. In this connection the court cited several cases for the proposition that the right to practice law is not a right protected by the civil rights statutes. Whatever may have been thought to be the law with respect to this right formerly, it has now been authoritatively decided by the Supreme Court that "a state cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. * * *" Schware v. Board of Bar Examiners, 353 U.S. 232, 238, 77 S.Ct. 752, 756, 1 L.Ed.2d 796. However, we do not believe the alleged interference here amounted to such interference with Sharp's activities as would amount to "excluding" him from the practice of law. The alleged interference here with Sharp's activities was directed to him as a member of the Negro public; if he accepted the restrictions, or special requirements, that Mrs. Lucky applied to all Negro registrants (according to the allegations of the complaint) plaintiff would not in any manner have been interfered with in serving his client.

■ This brings us then to this question: Does the complaint plainly set out a cause of action, that is, does it charge with sufficient clarity action by the defendant, in the operation of her office, which denies to the plaintiff, as a Negro, and to others of that race, sole-

2. "Equal rights under the law
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C.A. § 1981.

3. "Civil action for deprivation of rights
"Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C.A. § 1983.

4. "Civil rights
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
* * * * *
"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." 28 U.S.C.A. § 1343.

ly on account of race, rights which are guaranteed them under the Constitution and laws of the United States?

We think it plain that this suit alleges that when Sharp and his client, Tillman, went to Mrs. Lucky's office on business, for which her office existed and for which it was maintained by the State and Parish, she, in her official capacity, refused to deal with them "in her office" solely because they were Negroes, and sent them to another room in the courthouse. It is not necessary to make an extended statement in light of all of the related cases decided by this Court and the Supreme Court, to support our conclusion that such official conduct is not permissible. Having decided, as we have, that Harris County, Texas may not operate a segregated cafeteria, Derrington v. Plummer, 5 Cir., 240 F.2d 922; that St. Petersburg, Florida may not operate a segregated swimming pool, City of St. Petersburg v. Alsup, 5 Cir., 238 F.2d 830; and the Supreme Court having decided that the City of Atlanta may not operate a segregated golf course, Holmes v. City of Atlanta, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776, it is too plain for argument that Ouachita Parish, Louisiana may not, through its registrar of voters, operate a segregated registrar's office.

■ Moreover, we think it quite clear that the complaint alleged a proper case for a class action. Since, as we have stated, this is not to be construed as a suit for interference with plaintiff Sharp's rights as a lawyer, but as a Negro citizen, he may properly sue on behalf of all other Negro citizens, since they all have an identity of interest in having access to the public offices of the Parish on a non-segregated basis. Rule 23 F.R.C.P.; cf. City of St. Petersburg v. Alsup, supra; Orleans Parish School Board v. Bush, 5 Cir., 242 F.2d 156, certiorari denied 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed. 1436.

■ We do think it appropriate to state that appellant misconceives the ef-

fect of the alleged acts of defendant upon his right or duty to represent his client as to the measure of damages, if any, that he may be entitled to. There was no interference with plaintiff's adequately serving his client if he had been willing to subject himself to the restraints that were applicable, according to his allegations, to all Negroes; his damages, therefore, would not be augmented by any failure of his to obtain the relief which he sought for his client. Any damages to which he might be entitled are those to which any member of the class he represents would be entitled, in light of the circumstances, by reason of the alleged illegal segregation applicable to all Negroes.

The judgment is reversed for further proceedings not inconsistent with this opinion.

CAMERON, Circuit Judge.

I dissent.

CAMERON, Circuit Judge (dissenting).

The written opinion rendered by the District Court,[1] I find unanswerable. No good purpose would be served by repeating here what is there said, and I shall confine this dissent to an effort to amplify some of the statements of the published opinion and to add a few other facts and considerations.

## I.

(a) It is plain that appellant was not discriminated against in any way—that he was not denied any right given him by the Constitution of the United States. He went into the registrar's office only as the agent and attorney for his client. His entering the office and remaining there were not challenged in any way. He was a registered voter, and his registration had not been brought in question. His agency carried him wherever his principal should go. If the client had been represented by a white attorney, he would have been directed to the adjoining room exactly as appellant was. Moreover, if appellant had presented himself

as attorney for a white voter or for a Negro voter residing in one of the eight wards whose cards were in the office entered by appellant, the whole transaction would have been completed in that room.[2]

The fact that his client was sent to another room in violation of his constitutional rights—if such be the case—does not constitute any discrimination against appellant. An attorney is required to go wherever his client's business takes him. His client may be incarcerated in violation of his constitutional rights. But the lawyer must go to the jail to confer with him. Would it be contended that the lawyer's constitutional rights were violated if he were required to go to the jail to confer with a client so wrongfully placed in custody?

Assuming that his client's card was wrongfully placed in the adjoining room, that action was not taken against appellant and did not affect any of his rights.[3] It is not permissible that appellant's rights be thus borrowed from his client. The quotation by the District Court from the decision of this Court in Brown v. Board of Trustees of LaGrange Independent School District, 5 Cir., 187 F.2d 20, 25, disposes of this phase of appellant's contention: " * * * plaintiff has wholly failed to plead or prove any deprivation of his civil rights and it is elementary that he has no standing to sue for the deprivation of the civil rights of others. * * * "

(b) I cannot agree with the opinion of the majority in the assumption that

Schware v. Board of Bar Examiners, 353 U.S. 232, 239, 77 S.Ct. 752, 1 L.Ed.2d 796 has drawn into the voracious maw of federalism the regulation of the practice of law in the States. The narrow point there decided was whether a State could deny an applicant admission to its bar because of his former membership in the Communist Party and prosecution related thereto when the proof showed that he had in the interim severed his former connections and had served as a paratrooper in the Pacific theater of war and otherwise demonstrated his loyalty. The question dealt with by the court below in this case related alone to the relationship between attorney and client in the performance of one of the day-to-day tasks growing out of that relationship. I think the authorities cited by the court below are still good law and that they support the court's findings.

(c) The Brown case[4] also sustains the holding of the District Court and is contrary to the holding of the majority here in connection with the class action which the majority opinion approves. Brown had brought an action for the benefit of his daughter "and all other persons of Negro blood and African descent" upon the claim that the facilities furnished Negroes were not equal to those furnished white children. The language of Chief Judge Hutcheson applies precisely here:

"He [Brown] particularly insists that it is no answer to his complaint: that, though the Negro stud-

2. Of the 29,966 registered voters in Ouachita Parish, Louisiana, 4,441 white voters' registrations were challenged and 5,782 Negro voters' registrations were challenged. The appellee had no connection with those challenges. The office of the registrar was swamped by a deluge of those seeking to answer those challenges. The police jury of the county designated the police jury room, connected by a door with the registrar's office, was used as additional space for considering the merits of the various challenges. The registration cards of Negro voters from two wards were placed in the police jury room, while the cards of the Negro voters of the remaining eight wards remained in the registrar's office. This whole condition was temporary.

3. It is pertinent to speculate just how far the claim of discrimination even against the client would be stretched. Would his constitutional rights have been involved if, instead of being required to pass through a door to the adjoining room, his card had been placed on another desk in the same room? Would the same claim be made if the client were required to use a separate pen, or to sit in a separate chair? At some point *reductio ad absurdum* will necessarily be reached.

4. 187 F.2d at pages 24, 25.

ents have gotten the short end of the stick in respect to the matters he complains of, the white students have gotten it in others * * *

"The appellees, pointing out that plaintiff is not himself holding any end of the stick, short or long; that, therefore, under fundamental principles enshrined in the decisions dealing with civil rights claims under the Fourteenth Amendment, particularly with claims of the kind made here, he is not being deprived of any right personal to him, and that he has no standing to maintain this suit; insist that the suit should have been dismissed on that ground * * *

"All of these considerations, however, are completely beside the mark here, for plaintiff has wholly failed to plead or prove any deprivation of his civil rights and it is elementary that he has no standing to sue for the deprivation of the civil rights of others. What the Supreme Court said in McCabe v. Atchison, T. & S. F. Ry. Co., 235 U.S. 151, at pages 161–162 and 164, 35 S.Ct. 69, 71, 59 L.Ed. 169, and quoted with approval in State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 351, 59 S.Ct. 232, 83 L.Ed. 208, has precise application here:

" 'It is the individual who is entitled to the equal protection of the laws, and if he is denied * * * a facility or convenience * * * which, under substantially the same circumstances, is furnished to another traveler, he may properly complain that his constitutional privilege has been invaded.

" ' * * * The complainant cannot succeed because someone else may be hurt. Nor does it make any difference that other persons who may be injured are persons of the same race or occupation. It is the fact, clearly established, of injury to the complainant—not to others—which justify judicial intervention * * * ' "

Moreover, the Court was required, or at least had discretion, to decline to consider appellant's action as a class action under both the main opinion and the concurring opinion in Martinez v. Maverick County, etc., 5 Cir., 1955, 219 F.2d 666, 671, and 673. To the same effect is our recent case of Troup v. McCart, 5 Cir., 1956, 238 F.2d 289.

It is manifest that appellant cannot conduct this class action because he is not a member of the class he essays to represent.[5] The only right, personal to him, which appellant claimed had been violated was his right to represent his client Willie L. Tillman. The only class he could speak for would be attorneys similarly situated. His complaint shows that he was and is a registered voter. The complaint then charges "that plaintiff and the persons of the class they represent have been and are being refused the right to registrar [sic] to vote and/or answer correspondence from the registrar in her office soley [sic] because of their color and race." These averments demonstrate without the necessity of argument that appellant did not belong to the class whose constitutional rights were alleged to have been violated.

II.

My dissent would stop here if the majority opinion did not seem to be symptomatic of a disposition to stretch the so-called Civil Rights Statutes to cover doubtful cases despite the fact that, under the decisions of the Supreme Court and of this Court, these statutes must

5. The averments upon which he claims the right to proceed for the class are these: "That this is a class action authorized by rule 23(a) of the rules of Civil Procedure for the District Courts of the United States [28 U.S.C.A.]. The rights involved are of common and general interest to the members of the class represented by plaintiff, namely, Negro citizens of the State of Louisiana, similarly situated, who are duly qualified electors under the constitution and laws of the United States and of the State of Louisiana."

be narrowly applied if they are to be saved from unconstitutionality. A consideration of a few of the cases involving the treatment of these statutes[6] shows an undeviating policy by the Supreme Court of holding their application within narrow limits.[7]

In his concurring opinion in Hague v. C.I.O., 1939, 307 U.S. 496, 521, 59 S.Ct. 954, 966, 83 L.Ed. 1423, one of the landmarks in the development of the Supreme Court's attitude towards the Fourteenth Amendment and the statutes under consideration, Mr. Justice Stone wrote:

"Of the fifty or more cases which have been brought to this Court since the adoption of the Fourteenth Amendment in which state statutes have been assailed as violating the privileges and immunities clause, in only a single case was a statute held to infringe a privilege or immunity peculiar to citizenship of the United States. * * *

"The cases will be found collected in Footnote 2 of the dissenting opinion in Colgate v. Harvey, 296 U.S. 404, 445, 56 S.Ct. 252, 266, 80 L.Ed. 299 * * *"

The same reluctance to apply the statutes to executive action of state officials has been manifested. This attitude on the part of the Supreme Court is doubtless explained by the fact that this series of amorphous statutes, all cast in the same mold and aimed at enforcement of the "rights, privileges and immunities" clause of the Fourteenth Amendment, strike at the very heart of the relationship between the State and Federal governments and can be used to disrupt the whole constitutional concept unless held within narrow limits. We draw[8] again from the language of Mr. Justice Stone in the Hague case:

"The reason for this narrow construction of the clause and the consistently exhibited reluctance of this Court to enlarge its scope has been well understood since the decision of the Slaughter-House Cases. If its restraint upon state action were to be extended more than is needful to protect relationships between the citizen and the national government, and if it were to be deemed to extend to those fundamental rights of person and property attached to citizenship by the common law and enactments of the states when the Amendment was adopted, * * * it would enlarge Congressional and judicial control of state action and multiply restrictions upon it whose nature, though difficult to anticipate with precision, would be of sufficient gravity to cause serious apprehension for the rightful independence of local government. That was the issue fought out in the Slaughter-House Cases, with the decision against enlargement."

(b) One seeking to discover the attitude of the Supreme Court on the subject could not do better than to examine the language of the Slaughter-House

---

6. 42 U.S.C.A. §§ 1981, 1982, 1983 and 1985, and the corresponding criminal statutes, 18 U.S.C.A. §§ 241–244.

7. Following is a chronological list of the illustrative Supreme Court cases: In re Slaughter-House Cases, 1872, 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394; Minor v. Happersett, 1874, 21 Wall. 162, 88 U.S. 162, 22 L.Ed. 627; United States v. Cruikshank, 1875, 92 U.S. 542, 23 L.Ed. 588; United States v. Reese, 1875, 92 U.S. 214, 23 L.Ed. 563; State of Virginia v. Rives, 1879, 100 U.S. 313, 25 L.Ed. 667; Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Screws v. United States, 1945, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495; United States v. Williams, 1951, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758; Williams v. United States, 1951, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774; Tenney v. Brandhove, 1951, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019; Collins v. Hardyman, 1951, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253; Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138.

8. 307 U.S. at page 521, 59 S.Ct. at page 966.

Cases,[9] which the Supreme Court[10] had stated were decided "by a Court, every member of which had been appointed by President Lincoln, Grant, Hayes, Garfield or Arthur—all indoctrinated in the cause which produced the Fourteenth Amendment, but convinced that it was not to be used to centralize power so as to upset the federal system." This is the language of those cases employed by the Supreme Court practically contemporaneously with the passage of the statute under consideration:

> (16 Wall. at page 77) "It would be the vainest show of learning to attempt to prove by citations of authority, that up to the adoption of the recent amendments, no claim or pretence was set up that those rights depended on the Federal government for their existence or protection, beyond the very few express limitations which the Federal Constitution imposed upon the States—such, for instance, as the prohibition against ex post facto laws, bills of attainder, and laws impairing the obligation of contracts. But with the exception of these and a few other restrictions, *the entire domain of the privileges and immunities of citizens of the States, as above defined, lay within the constitutional and legislative power of the States and without that of* the Federal government. Was it the purpose of the fourteenth amendment, by the simple declaration that no State should make or enforce any law which shall abridge the privileges and immunities of *citizens of the United States,* to transfer the security and protection of all the civil rights which we have mentioned, from the States to the Federal government? And where it is declared that Congress shall have the power to enforce that article, *was it intended to bring within the power of Congress the entire do-main of civil rights heretofore belonging exclusively to the States?"* [Emphasis added.]

The Court then proceeds to state that, if the arguments advanced before it should be followed, they (16 Wall. at page 78) "would constitute this court a perpetual censor upon all legislation of the States, *on the civil rights of their own citizens,* with authority to nullify such as it did not approve as consistent with those rights, as they existed at the time of the adoption of this amendment. \* \* \* But when, as in the case before us, these consequences are so serious, so far-reaching and pervading, so great a departure from the structure and spirit of our institutions; when the effect is to fetter and degrade the State governments by subjecting them to the control of Congress, in the exercise of powers heretofore universally conceded to them of the most ordinary and fundamental character; when in fact it radically changes the whole theory of the relations of the State and Federal governments to each other and of both these governments to the people; the argument has a force that is irresistible, in the absence of language which expresses such a purpose too clearly to admit of doubt." [Emphasis added.]

The Court, after a further discussion of the history of the Civil War Amendments, concluded with these words which have been the lodestar for decision by the courts ever since their utterance:

> (16 Wall. at page 82) "\* \* \* Under the pressure of all the excited feeling growing out of the war, our statesmen have still believed that the *existence of the States with powers for domestic and local government, including the regulation of civil rights—the rights of person and of property—was essential to the perfect working of our complex form of government,* though they have thought proper to impose ad-

---

9. 1872, 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394.

10. In Collins v. Hardyman, 1951, 341 U.S. 651, 657–658, 71 S.Ct. 937, 940, 95 L.Ed. 1253.

ditional limitations on the States, and to confer additional power on that of the Nation.

"But whatever fluctuations may be seen in the history of public opinion on this subject during the period of our national existence, we think it will be found that this court, so far as its functions required, has always held with a steady and an even hand the balance between State and Federal power, and we trust that such may continue to be the history of its relation to that subject * * *" [Emphasis supplied.]

(c) A case which went up from this Court[11] brought the concept of narrow construction to definitive terms. Screws, a sheriff, and Jones, a policeman, aided by a private citizen beat to death Robert Hall, a Negro whom the officers had arrested, claiming that their action was in defense of their lives. They were indicted and convicted under 18 U.S.C.A. § 242, the criminal counterpart of the statute with which we are dealing. Judge Waller, of this Court, "unapprovingly"[12] wrote the decision of the majority affirming the conviction, and Judge Sibley wrote a vigorous dissent[13] setting forth his opinion that the statute was too vague and indefinite for enforcement, and expressing the view that the crime, which he considered heinous, ought to be punished under Georgia law.

The Supreme Court reversed, and in order to rescue the statute from total unconstitutionality it raised a question not argued before it or before this Court or before the trial court, and held that the statute could be squared with the Constitution only if it was construed so as to require that Screws et al. must have proceeded with the intent to violate rights guaranteed to their victim by the Constitution of the United States:

(325 U.S. at page 105, 65 S.Ct. at page 1037.) "The Act so construed has a narrower range in all its applications than if it were interpreted in the manner urged by the government. * * *"

(325 U.S. at pages 108–109, 65 S. Ct. at page 1039.) "* * * The fact that a prisoner is assaulted, injured, or even murdered by state officials does not necessarily mean that he is deprived of any right protected or secured by the Constitution or laws of the United States * * * The Fourteenth Amendment did not alter the basic relations between the States and the national government."

The foregoing was written by Mr. Justice Douglas after he had stated: (325 U.S. at page 100, 65 S.Ct. at page 1035.) "* * * we are of the view that if § 20 is confined more narrowly than the lower courts confined it, it can be preserved as one of the sanctions to the great rights which the Fourteenth Amendment was designed to secure."

(d) And it was Mr. Justice Douglas who wrote, in Williams v. United States:[14] "* * * as we held in Screws v. United States, a *close construction* will often save an act from vagueness that is fatal. The present case is as good an illustration as any." [Emphasis supplied.]

(e) And in Snowden v. Hughes, supra, [321 U.S. 1, 64 S.Ct. 402] the Supreme Court affirmed the dismissal of a damage suit brought against state officers who refused to certify plaintiff as a party nominee because the language of the complaint did not bring the case within the narrow confines of the statute under consideration despite the inclusion therein of "the opprobrious epithets 'willful' and 'malicious' * * * [and] by characterizing that failure as an unequal,

11. Screws v. United States, 5 Cir., 1944, 140 F.2d 662, reversed by Supreme Court, 325 U.S. 91, 65 S.Ct. 1031, 89 L. Ed. 1495.

12. 140 F.2d 663.

13. 140 F.2d 666.

14. 341 U.S. 97, 101, 71 S.Ct. 576, 579, 95 L.Ed. 774.

unjust, and oppressive administration of the laws of Illinois."

(f) And the Supreme Court has recently rejected two other efforts to invoke this statute against the functioning of state officials. In Tenney v. Brandhove, supra, a damage suit against legislative committeemen of the California legislature was held properly dismissed where the claim was that they had exceeded the bounds of legislative power depriving the plaintiffs of their constitutional rights; and in Stefanelli v. Minard, supra, the Supreme Court approved the action of a district court in declining to exercise its equity jurisdiction to arrest introduction in a state court of evidence allegedly obtained in contravention of the Fourteenth Amendment, using this language:[15] "Regardless of differences in particular cases, however, the Court's lodestar of adjudication has been that the statute 'should be construed so as to respect the proper balance between the States and the federal government * * *' Screws v. United States, 325 U.S. 91, 108, 65 S.Ct. 1031, 1039, 89 L.Ed. 1495. Only last term we reiterated our conviction that the Civil Rights Act 'was not to be used to centralize power so as to upset the federal system.' Collins v. Hardyman, 341 U.S. 651, 658, 71 S.Ct. 937, 95 L.Ed. 1253. Discretionary refusal to exercise equitable power under the Act to interfere with State criminal prosecution is one of the devices we have sanctioned for preserving this balance. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324."

### III.

The Supreme Court recently referred thus to the so-called Civil Rights Statutes:[16]

"The Act was among the last of the reconstruction legislation to be based on the 'conquered province' theory which prevailed in Congress for a period following the Civil War."[17]

That theory has not been without adherents from the Civil War days to the present, and those in quest of such can find decisions of courts other than the Supreme Court making broad and liberal application of these statutes under that theory.

But members of this Court, scions of the race who were the hapless victims of the "conquered province" doctrine, have been steadfast in following the Supreme Court in the close and narrow application of this series of statutes. Consideration of a few of our cases will suffice to demonstrate the traditional attitude of this Court.

(a) In McGuire v. Todd, 1952, 198 F.2d 60, 63, certiorari denied 344 U.S. 835, 73 S.Ct. 44, 97 L.Ed. 649, this Court affirmed the action of the District Court in dismissing for failure to state a claim a damage suit brought under the statute before us.[18] This Court, after pointing

---

15. 342 U.S. 121, 72 S.Ct. 121.

16. Collins v. Hardyman, 1950, 341 U.S. 651, 656, 71 S.Ct. 937, 939, 95 L.Ed. 1253. The Court was there dealing with 42 U.S.C.A. § 1985, the twin brother of the statute before us, but the reference was manifestly to the whole group.

17. The same language could as well be used concerning the Fourteenth Amendment itself. See "The Dubious Origin of the Fourteenth Amendment" by Walter J. Suthon, Jr., Vol. XXVIII, No. 1, Tulane Law Review, pages 22–29, 31, 33, et seq. And see also "The Tragic Era" by Claude G. Bowers, Chapters III, VI, and X.

18. The action was against officials of the City of Dallas and contained the averment that "all acts and omissions of defendants were under color and pretense of statutes, ordinances, codes, regulations, customs and usages of City of Dallas and State of Texas and constitute state action within the meaning of the 14th Amendment and applicable laws of the United States * * * [That] said ordinance is unconstitutional and void and was enforced against plaintiffs in an unconstitutional and discriminating manner * * * [And that defendants] negligently, knowingly, wilfully, and with the intentional purpose of depriving Dallas citizens and these plaintiffs of their constitutional rights" committed the actions complained of.

out the sharply drawn line between courts belonging to the two schools of thought and listing illustrative decisions on each side, approved the dismissal of the complaint, using this language through Chief Judge Hutcheson:

"It is sufficient for us in this case to say: that, as other courts have done, we disregard, as mere conclusions, the loose and general, the factually unsupported, characterizations of the complained of acts of the defendant, as malicious, conspiratorial, and done for the purpose of depriving plaintiffs of their constitutional rights; that the things defendants are alleged to have done, as distinguished from the conclusions of the pleaders with respect to them, do not constitute a deprivation of the civil rights of plaintiffs, do not give rise to the cause of action claimed; and that the judgment dismissing the complaint should be affirmed."

(b) In Charlton v. City of Hialeah, 1951, 188 F.2d 421, we approved the action of a District Court in dismissing for failure to state a claim within federal competence a complaint charging that the police officers of Hialeah, Florida, and certain private individuals were engaged in an unholy alliance and conspiracy to arrest and mistreat plaintiff and others in contravention of their Fourteenth Amendment rights; and a like result was reached in Hewitt v. City of Jacksonville, 5 Cir., 1951, 188 F.2d 423, where plaintiff claimed to have been shot while a prisoner confined on the prison farm of the City of Jacksonville.

(c) In Whittington v. Johnston, 1953, 201 F.2d 810, we sustained the action of a District Court in Alabama [19] in dismissing a complaint brought under the statute before us *inter alia* wherein it was charged that plaintiff was incarcerated by private individuals acting in concert with State officers. Judge Rives filed a dissenting opinion bottomed upon the theory of broad and liberal application consistently rejected by the Supreme Court and by this Court. The dissent also adverts to the fact that it is significant that the restrictive language comes from the cases alone, while the language of the Civil Rights Acts themselves is spacious. The answer to this argument is that the Civil Rights Acts are cast in such nebulous terms as to be practically unenforceable, and that the Supreme Court was able to rescue them from manifest unconstitutionality only by adding words of restriction through the medium of construction.

The Supreme Court has made this plain in a number of references to the doubts surrounding the whole structure of the Civil Rights Acts.[20] "This Act has given rise to differences of application here. Such differences inhere in the attempt to construe the remaining fragments of a comprehensive enactment, dismembered by partial repeal and invalidity, loosely and blindly drafted in the first instance, and drawing on the whole Constitution itself for its scope and meaning." In a later case, the Court referred to the statutes in similar terms: [21] "The dominant conditions of the Reconstruction Period were not conducive to the enactment of carefully considered and coherent legislation. Strong post-war feeling caused inadequate deliberation and led to loose and careless phrasing of laws relating to the new political issues."

And that Court, referring to 42 U.S.C.A. § 1985,[22] stated: "The Act, popularly known as the Ku Klux Act, was passed by a partisan vote in a highly inflamed atmosphere. It was preceded by spirited debate which pointed out its grave character and susceptibility to abuse, and its defects were soon realized

---

19. 102 F.Supp. 352.

20. E. g. Stefanelli v. Minard, supra, 342 U.S. at pages 117, 121, 72 S.Ct. at pages 118, 120.

21. United States v. Williams, 1951, 341 U.S. 70, 74, 71 S.Ct. 581, 583, 95 L.Ed. 758.

22. Collins v. Hardyman, 1951, 341 U.S. 651, 657, 71 S.Ct. 937, 939, 95 L.Ed. 1253.

when its execution brought about a severe reaction." (Citing Bowers, "The Tragic Era", pp. 340–348.)

The Court also there stated (341 U.S. at page 657, 71 S.Ct. at page 940): "The provision establishing criminal conspiracies in language indistinguishable from that used to describe civil conspiracies came to judgment in United States v. Harris, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290. It was held unconstitutional. * * * " [23]

It is significant also that in one of the last cases wherein the Supreme Court has been able to sustain the constitutionality of one of these statutes,[24] it was stated that the Act was saved only by a "close construction" and Justices Black, Frankfurter, Jackson and Minton dissented [25] even from that close construction.

(d) In Yglesias v. Gulfstream Park Racing Association, 1953, 201 F.2d 817, this Court (with Judge Rives dissenting) upheld the action of a Florida District Court in dismissing for want of jurisdiction a complaint charging that the Racing Association, acting in concert and conspiracy with police officers of a Florida city, caused plaintiff to be deprived of her constitutional rights by causing her to be falsely imprisoned and held

---

**23.** Like language has been used in numerous dissents referring to the statutes which were passed to enforce the Fourteenth Amendment, e. g., that of Mr. Justice Roberts in Screws v. United States, supra, 325 U.S. at page 140, et seq., 65 S.Ct. at page 1054: "Accordingly, Congress passed various measures for its enforcement. It is familiar history that much of this legislation was born of that vengeful spirit which to no small degree envenomed the Reconstruction era. Legislative respect for constitutional limitations was not at its height and Congress passed laws clearly unconstitutional. See In re Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. * * *

" * * * But to attribute to Congress the making overnight of a revolutionary change in the balance of the political relations between the National Government and the States without reason, is a very different thing. * * * The desire for such a dislocation in our federal system plainly was not contemplated by the Lyman Trumbulls and the John Shermans, and not even by the Thaddeus Stevenses." 325 U.S. at page 144, 65 S.Ct. at page 1059.

(325 U.S. at page 152, 65 S.Ct. at page 1059) "It cannot be too often emphasized that as basic a difference as any between our notions of law and those of legal systems not founded on Anglo-American conceptions of liberty is that crimes must be defined by the legislature. The legislature does not meet this requirement by issuing a blank check to courts for their retrospective finding that some act done in the past comes within the contingencies and conflicts that inhere in ascertaining the content of the Fourteenth Amendment by 'the gradual process of judicial inclusion and exclusion.' "

After quoting several pages of assurances given in the Government's brief that "the Department of Justice has established a policy of strict self-limitation with regard to prosecutions under the civil rights acts", the dissent (325 U.S. at page 160, 65 S.Ct. at page 1062) uses this language:

"But such a 'policy of strict self-limitation' is not accompanied by assurance of permanent tenure and immortality of those who make it the policy. Evil men are rarely given power; they take it over from better men to whom it had been entrusted. There can be no doubt that this shapeless and all-embracing statute can serve as a dangerous instrument of political intimidation and coercion in the hands of those so inclined.

"We are told local authorities cannot be relied upon for courageous and prompt action, * * * In any event, the cure is a re-invigoration of State responsibility. It is not an undue incursion of remote federal authority into local duties with consequent debilitation of local responsibility."

**24.** Williams v. United States, 1951, 341 U.S. 97, 101, 71 S.Ct. 576, 95 L.Ed. 774, dealing with 18 U.S.C.A. § 242, the criminal counterpart of the present Act.

**25.** The dissenting opinion reads (341 U.S. at page 104, 71 S.Ct. at page 581): "Experience in the effort to apply the doctrine of Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, leads Mr. Justice Frankfurter, Mr. Justice Jackson and Mr. Justice Minton to dissent for the reasons set forth in the dissent in that case."

without opportunity to confer with counsel, all in violation of the due process clause of the Fourteenth Amendment. Here is some of the language of the opinion (at page 818): "But to show that defendant deprived plaintiff of rights and immunities secured by the Fourteenth Amendment, or caused it to be done, or conspired to that end, plaintiff relies upon bare generalities and conclusions, unsupported by factual allegations. * * * It has frequently been held, * * * that where the alleged claim under the Constitution or federal statutes clearly appears to be colorable, or made solely for the purpose of creating federal jurisdiction over what would otherwise be an action to vindicate a right arising only under state law, and no substantial facts establishing federal jurisdiction are alleged, mere conclusions asserting the violation of a constitutional right are insufficient."

(e) This Court, in Dinwiddie v. Brown, 1956, 230 F.2d 465, reviewed the whole course of the efforts to induce the Court to apply a broad instead of a narrow and restricted test to suits invoking the Civil Rights statutes, and sustained the action of a District Court in Texas granting a motion to dismiss, treating it as a motion for summary judgment. We there pointed out that suit involving title to property was brought against certain individual citizens of Texas and against Texas officials who, the plaintiffs alleged, conspired with the individual citizens in dispossessing plaintiffs of their land.[26] Plaintiffs further alleged that Texas' segregation laws operated to deprive them of their constitutional rights, that the word of a Negro was not accepted in Texas courts when a white person testified to the contrary, and that the laws of Texas fostered an attitude of white supremacy tending to degrade the Negro and make his oath worthless in the state court.

We held that such vague assertions could not be used to support actions under the civil rights statutes, the palpable base for the holding being that this Court was committed to a narrow application of the Civil Rights statutes. A like result was reached in No. 16,848, Roark v. West, 5 Cir., 1958, 251 F.2d 956.

And in Simmons v. Whitaker, 5 Cir., 1958, 252 F.2d 224, we upheld dismissal by a district court of a claim based explicitly on the statute before us, emphasizing again that this Court is committed to a narrow and restrictive view of the application of the Civil Rights statutes.

## IV.

Nothing but a definite conviction that the Civil Rights statutes must be narrowly and strictly construed can account for this large number of cases wherein the Supreme Court and this Court have approved dismissal of complaints for failure to state claims supporting federal jurisdiction. What the courts have been doing is to apply to such complaints strict rules of pleading not unlike those which, by Rule 9(b) F.R.C.P., 28 U.S.C.A.,[27] are provided with respect to averments of fraud. In fact, this Court in an opinion by Chief Judge Hutcheson [28] quoted at length from the *civil rights* case of McGuire v. Todd, supra, as spelling out the rule which should be applied to pleadings in a *fraud* case.

26. Definite reliance by the plaintiffs on the Civil Rights Statutes is exemplified by this quotation from Count 2 of the complaint: "Plaintiff further charges the defendants with, acting under color of state statute, ordinance, regulation, custom, or usage, unlawfully conspiring to defraud plaintiff of her rights, privileges and immunities as a citizen of the United States as guaranteed by Amendments Five and Fourteen of the Constitution and the Acts of Congress as contained in Title 8, Section 41, 42, and 27, United States Code Anno. transferred to Title 42, Welfare Code, United States of America, Anno. Sections 1981, 1982, 1983, and 1985 .* * *."

27. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

28. Tucker v. National Linen Service Corp., 1953, 200 F.2d 858, 864.

It is clear that, in both civil rights and fraud cases, the averments of the complaint must set out specifically the facts clearly, convincingly and cogently [29] in order to sustain this limited and special federal jurisdiction. If this is not done, a federal court will not intrude upon a sphere of jurisdiction belonging, under our constitutional system, to the States.

From the foregoing, it is plain that above ninety percent of these cases coming before the Supreme Court and this Court have been dismissed on jurisdictional grounds. I think this case belongs in that ninety percent class.

### V.

Few men in our times have had such intimate contact with the various departments of our government, both state and federal, or such favorable opportunity to compare our institutions with those of other countries as Mr. Justice Jackson. And few have exhibited so much insight into the problems of self-government or such breadth of vision in seeking their solution. On the day before his death, he had worked several hours revising his third Godkin Lecture to the Harvard Graduate School of Public Administration,[30] and these words are taken from that lecture and represent the mature views of a brilliant and dedicated public servant concerning the nature of our institutions:[31]

"Considerations of a different nature arise from interferences with states' rights under the vague and ambiguous mandate of the Fourteenth Amendment. The legislative history of that Amendment is not enlightening, and the history of its ratification is not edifying. * *

" * * * The Court has been drawing into the federal system more and more control by federal agencies over local police agencies. I have no doubt that the latter are often guilty of serious invasions of individual rights. But there are more fundamental questions involved in the interpretation of the antiquated, cumbersome, and vague civil rights statutes which give the Department of Justice the right to prosecute state officials. If the Department of Justice must prosecute local officials, the F.B.I. must investigate them, and no local agency which is subject to federal investigation, inspection, and discipline is a free agency. I cannot say that our country could have no central police without becoming totalitarian, but I can say with great conviction that it cannot become totalitarian without a centralized national police. At his trial Herman Goering, with great candor, related the steps by which the Nazi Party obtained complete domination of Germany, and one of the first was the establishment of the supremacy of the national over the local police authorities. So it was in Russia, and so it has been in every totalitarian state. * * * I believe that the safeguard of our liberty lies in limiting any national policing or investigative organization, first of all to a small number of strictly federal offenses, and secondly to nonpolitical ones. * * *

"It is a difficult question and always will remain a debatable question where, in particular instances, federal due process should step into state court proceedings and set them aside. When the state courts render harsh or unconsidered judgments,

29. Cf. Ramey v. Koons, 5 Cir., 1956, 230 F.2d 802, 805; United States v. City of Brookhaven, 5 Cir., 1943, 134 F.2d 442, 445; Rubens v. Ellis, 5 Cir., 1953, 202 F.2d 415, 417. And cf. Voliva v. Bennett, 5 Cir., 1953, 201 F.2d 434; Saenz v. Kenedy, 5 Cir., 1949, 178 F.2d 417, 419; Continental Casualty Co. v. First National Bank, 5 Cir., 1941, 116 F.2d 885, 887, 135 A.L.R. 1141; and Jemison v. Commissioner of Internal Revenue, 5 Cir., 1930, 45 F.2d 4, 5.

30. "The Supreme Court in the American System of Government", Harvard University Press, 1955, Foreword, Page vii.

31. Ib. p. 68 and 70-73.

they invite this power to be used. But I think in the long run the transgressions of liberty by the federal government, with its all powerful organization, are much more to be feared than those by the several states, which have a greater capacity for self-correction."

Here is the expression by a modern scholar in the field of government of the same fundamental idea as the Justices expressed in 1872 in the Slaughter House Cases, supra: that too much government from too far off is tyranny—tyranny whose iron heel is felt by the supposed beneficiary as well as the intended victim. This nation learned this lesson the hard way.[32] Of the years when such a policy was in full flower the author, in the Preface of the book mentioned in the last footnote, states:

"If Hilare Belloc is right in his opinion that 'readable history is melodrama' the true story of the twelve tragic years that followed the death of Lincoln should be entertaining * * * The Constitution was treated as a doormat on which politicians and army officers wiped their feet after wading in the muck. Never has the Supreme Court been treated with such ineffable contempt, and never has that tribunal so often cringed before the clamor of the mob. * * * The story of this Revolution is one of desperate enterprises, by daring and unscrupulous men, some of whom had genius of a high order. In these no Americans can take pride. The evil that they did lives after them * * * "

This sad epoch in our history was fomented in no small part, by well-intentioned men in too much of a hurry. The basic lesson wise men have learned from its excesses and its tragedies is that civil rights can be insured and protected only by local government administered by men with a sympathetic understanding of the many facets of the problems involved; men who approach their task in a spirit of friendship and local obligation. Government can succeed only where its mandates deserve and command the respect and the consent of the governed. Only harm can ensue from a policy which gives federal functionaries license to ride herd over state officials.

If we, in whose hands responsibility for leadership and judgment is placed, open our eyes to the teachings of history and perform our duties with patience, with sympathy and with common sense, we shall make a contribution towards averting a repetition of an epoch from which nobody derived any benefit and in which everybody suffered.

---

32. The story was told in words the whole world has accepted, by Claude G. Bowers in his book "The Tragic Era".