**James SHARP, Jr.,**

v.

**Mrs. Mae LUCKY, Registrar of Voters, Ouachita Parish.**

**Civ. A. 5734.**

United States District Court
W. D. Louisiana,
Monroe Division.

Sept. 15, 1958.

---

4. Sections 445 and 817 of Title 38 U.S.C.A.

James Sharp, Jr., Monroe, La., for plaintiff.

Albin P. Lassiter, Dist. Atty., Ouachita Parish, Fred Fudickar, Jr., Monroe, La., Jack P. F. Gremillion, Atty. Gen., State of Louisiana, George M. Ponder, First Asst. Atty. Gen., State of Louisiana, William C. Bradley, and Kenneth C. Banfield, Jr., Special Counsel to the Atty. Gen., State of Louisiana, Baton Rouge, La., for defendant.

DAWKINS, Chief Judge.

When this case was here before, plaintiff presented it purely and simply on the theory that his rights as a lawyer had been violated. He even claimed he had been damaged "in his profession" to the extent of $25,000, which he demanded from plaintiff, in addition to his prayer for declaratory and injunctive relief. This is shown, as clearly as plain English can do so, by the verbatim quotations from his complaint set forth in our original opinion, Sharp v. Lucky, D.C., 148 F.Supp. 8, at page 9.

Finding, on the authority of two Supreme Court decisions and holdings by the Eighth and Ninth Circuits, that interference with, or discrimination against, the practice of law did not involve Federal civil rights, we dismissed the case for want of jurisdiction, 148 F. Supp. at page 12.

On appeal, plaintiff completely changed his position by asserting that he sought relief, not as an attorney, but as a negro. Notwithstanding its own prior rulings, and the great weight of authority everywhere, holding that such an about-face will not be permitted,[1] two

1. 3 American Jurisprudence, "Appeal and Error", § 253, p. 35:
"*Doctrine of Adherence to Theory Pursued Below.*—It is well settled that the theory upon which the case was tried in the court below must be strictly adhered to on appeal or review. Under this rule, a party will not be permitted, in the appellate or reviewing court, to assume a position inconsistent with that occupied by him in the trial court with respect to the grounds or theory of recovery or relief or of defense or opposition, the nature or sufficiency of pleadings, the admissibility or sufficiency of evidence, or the burden of proof." (Citing 14 U. S.

Supreme Court cases, and a plethora of others from practically all State courts.)
4 C.J.S. Appeal & Error § 228, p. 665 et seq.:
"Generally, sometimes by virtue of express statutory provision, questions, of whatever nature, not raised and properly preserved for review in the trial court, will not be noticed on appeal; and a fortiori, where counsel declares on the trial in open court that only a certain question is involved in the case, or where, by stipulation, the case is submitted only on a certain question, other questions cannot be raised in the appellate court."
§ 232, p. 674 et seq.:

members of a three-judge panel of the Fifth Circuit Court of Appeals reversed our ruling and not only allowed plaintiff to maintain his suit in his new capacity, but held that he could prosecute it as a class action in behalf of all other Negroes similarly situated.[2] We are bound by that Court's mandate, which is the law of this case.

Thus vicariously recast, plaintiff's complaint is that defendant, the Registrar of Voters for Ouachita Parish, Louisiana, has been and still is guilty of violating his rights and those of other Negroes, by segregating the white and Negro races in her office. He seeks a declaratory judgment to that effect, and an injunction against any future official conduct intended to accomplish that result. Since the case was returned here for further action, he formally has abandoned and dismissed his claim for damages.

As soon as our Calendar permitted, after receipt of the appellate Court's mandate, we tried the case on its merits, hearing testimony from a number of witnesses. We have studied the record and briefs and now have arrived at our Findings of Fact, based upon the evidence we believe, and our Conclusions of Law, as follows:

Defendant has been the Registrar of Voters for Ouachita Parish, Louisiana, since January 1, 1953. Her assistant is Mrs. Mae Morin, who has served as such since 1955.

The Registrar's office is located on the second floor of the Ouachita Parish Court House, in Monroe, Louisiana. It is a room about 25 feet square. Immediately adjacent to it is the Police Jury Room, which is somewhat larger. These rooms are connected by a doorway, both also having separate doors entering into a central hallway.

Normally, the Police Jury Room is kept closed except when that public body meets officially, about once a month. The Registrar's office, however, is in daily use. Toward the front of this office, and crosswise of the room, about 10 feet from the hallway entrance, is a large chest-high counter which extends almost from one wall to another, at which persons having business with the Registrar are served. Behind the counter are two desks, chairs and record cases. There is no counter in the Police Jury Room, and it is furnished with tables, chairs and benches. Ordinarily, the door between the two rooms is kept closed.

In addition to these rooms, the District Court Room and a number of other offices are located on the second floor of the Court House.

In early August, 1956, in keeping with her duty under the State law[3] and in preparation for the presidential election to be held in November of that year, defendant proceeded to "purge" the voter registration rolls in her office. This consisted of examining each registration card, and determining whether the registrant was, or had become, disqualified to vote.[4] In any case where a disqualification was noted, defendant sent a challenge to the person concerned, requiring that he present himself at the office within a stated delay to justify his continued registration, or to re-register.

On August 13, 1956, defendant sent out approximately 1,500 challenges, of which about 1,000 went to white voters and 500 to Negroes. All of the Negroes whose registrations were challenged resided in Wards 3 and 10 of Ouachita Parish, located within the city limits of Monroe,

"Under the rule that questions not raised in the lower court will not be considered on appeal, a party is prevented from obtaining on appeal relief which was not asked for in the court below, and as a rule plaintiff cannot set up for the first time on appeal a cause of action or ground of recovery not relied on or brought up in the lower court."

See also Indiviglio v. United States, 5 Cir. 1957, 249 F.2d 549, at page 560, and authorities there cited.

2. Sharp v. Lucky, 5 Cir., 252 F.2d 910.

3. LSA–R.S. 18:131.

4. LSA–R.S. 18:132.

there being a total of ten wards in the Parish.

Soon after the challenges were issued, voters of both races began pouring into defendant's office to answer them. Not only was the Registrar's office filled to capacity, the entire hallway on the second floor became congested with members of both races. Of their own volition, and not because of anything done by defendant or her deputy, most Negroes stood back and allowed white persons to go ahead of them, with the result that the Negroes were not being fairly and adequately served.

Because of this, defendant made arrangements with Police Jury officials to use its room to handle the overflow; and, since Negroes had not been receiving service on a "first-come-first-served" basis, it was decided to place the registration cards of those Negroes who had been challenged, from Wards 3 and 10, in the Police Jury Room. The substantially larger number of cards of all other Negro registrants from those two wards, and from the eight other wards of the Parish, were left in defendant's office.

This method of operation gave the challenged Negro registrants better physical facilities than the whites, because they could sit down at the chairs, tables and benches in the Police Jury Room, whereas the much larger number of white persons had to stand in the hallways and at the counter in defendant's office, it being possible to serve only a few at a time. Negroes also were handled much faster than the whites because of this.

So well did the system work, so advantageous was it to the Negroes, that several Negro leaders thanked defendant for having made it possible that a larger number of Negroes could answer challenges in a more comfortable manner; while many other Negroes showed their appreciation by bringing flowers and gifts of various kinds to defendant.

This system was continued until August 31, 1956, when the rush was over. Then all of the remaining challenged negro registration cards were returned to defendant's office, where they and all other cards, Negro and white, have remained ever since. The only other occasion in the history of defendant's official service when Negroes used the Police Jury Room, for dealing with the Registrar's office, was in the late fall and early winter of 1955. At that time, just prior to the state gubernatorial election held in January, 1956, large numbers of both races were crowding into defendant's office for the purpose of registering to vote. Because the Negroes were not being fairly and adequately served, due not to any fault of defendant or her assistant but to their own deference to the white persons present, and in order better to accommodate them, defendant used the Police Jury Room in which to register them, thus affording them more comfortable facilities as well as being able to register a much greater number than otherwise would have been possible. For this consideration, defendant and her assistant also received thanks, and expressions of appreciation, from many of the Negroes.

All that we have just related stands undisputed in the evidence.

On August 25th, 1956, plaintiff accompanied his client, Willie Tillman, whose registration had been challenged, to defendant's office. There is a dispute in the testimony as to what then occurred. Plaintiff, Tillman, and a Mrs. Vera Hill (also a negro) testified that defendant told plaintiff she did not serve Negroes in her office and that they would have to go to the Police Jury Room next door, where her assistant would wait on them. Defendant testified that all she told them was that Tillman's card was in the Police Jury Room, not her office, and that Mrs. Morin would wait on them there.

From our observation of the demeanor of these witnesses on the stand, and having noted the "pat" version of the incident as given by plaintiff, Tillman, and Mrs. Hill, we believe Mrs. Lucky's version, for she impressed us, above all else, as a completely honest person. Irrespective of that, however, the point really is of no great importance in view of the

facts already related, and those [5] we now proceed to set forth.

The crucial, undisputed truth is that what was done so obviously was not intended as a discrimination—a designedly malicious segregation of Negroes—but was for their advantage and convenience. Defendant, and her assistant, testified that they never, at any time, had any intention of discriminating against Negroes, nor would they do so in the future. Quite to the contrary, they were trying to help them. Even in April and May of 1956, after thousands of registered voters of both races had been challenged by Citizens Council members,[6] and the Court House was literally swarming with people, Negroes and whites were handled indiscriminately in defendant's office without segregation of any kind. Except as related, and for the reasons already given, on no occasion except during the latter part of August of 1956, have the cards of Negroes and whites been separated or segregated. Even on the single date of which plaintiff complains, and to which his evidence exclusively relates, if a Negro or white citizen had wanted to transact business with defendant respecting the registration of any Negro in Wards 1, 2, 4, 5, 6, 7, 8 or 9, or as to unchallenged Negro registrations in Wards 3 and 10, they would have done so in defendant's office, not in the Police Jury Room. Moreover, in August of 1956, any new negro registrant likewise would have been handled in defendant's office. Since August 31, 1956, all cards of both races have been kept in defendant's office without distinction, and it is her intention to keep them there in the future.

■ In the light of these facts, if a wrong was done—and we are convinced there was no purposeful discrimination here against plaintiff or any of the class he represents—then the undisputed evidence shows that there is assuredly " * * * no reasonable expectation that the alleged wrong will be repeated.",[7] the arrangement of which plaintiff complains having been of less than three weeks' duration and having been stopped voluntarily almost a month before this suit was filed. In such circumstances, should a Court of equity, exercising a fair and reasonable discretion, as we are bound to do, issue a harsh decree forbidding defendant to do something she long since has stopped? We are sure that we should not. A decent respect for the comity which prevails between state and federal authority practically compels this conclusion. 28 American Jurisprudence, "Injunctions", § 24, p. 217, states:

> "The extraordinary character of the injunctive remedy and the danger that its use in improper cases may result in serious loss or inconvenience to an innocent party require that the power to issue it should not be lightly indulged in, but should be exercised sparingly and cautiously, only after thoughtful deliberation, and with a full conviction on the part of the court of its urgent necessity. In other words, the relief should be awarded only in clear cases, reasonably free from doubt, and, when necessary, to prevent great and irreparable injury. The court should therefore be guided by the fact that the burden of proof rests upon the complainant to establish the material allegations entitling him to relief."

■ Especially should an injunction not be issued where there has been, as here, a voluntary discontinuance of an

5. Plaintiff and one other witness testified further that there was a sign marked "Colored" on a table between defendant's office and the Police Jury Room. In our judgment this is a pure fabrication which did not exist. Both defendant and Mrs. Morin denied this; and if it had been true, surely plaintiff could have produced many other witnesses to prove it.

6. Of the 29,966 registered voters in Ouachita Parish at that time, 4,441 white voters' registrations were challenged as were 5,782 negro registrations. See Sharp v. Lucky, 5 Cir., 252 F.2d 910, at page 914, fn. 2.

7. From Derrington v. Plummer, 5 Cir., 240 F.2d 922, 925, cited and principally relied on by plaintiff.

**410**

alleged illegal activity, accompanied by a *bona fide* intention to comply with the law and not to resume the "wrongful" acts.[8]

For these reasons, in the exercise of the discretion with which we are vested, we find that plaintiff is not entitled to the declaratory and injunctive relief which he demands. Accordingly, his suit will be dismissed.

A proper decree should be presented on notice.

---

8. Walling v. Youngerman-Reynolds Hardwood Co., Inc., 325 U.S. 419, 421, 65 S.Ct. 1242, 1243, 89 L.Ed. 1705:

"While 'voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power,' Walling v. Helmerich & Payne, 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29, it may justify a court's refusal to enjoin future activity of this nature when it is combined with a bona fide intention to comply with the law and not to resume the wrongful acts."

See also to the same effect United States v. United States Steel Corp., 251 U.S. 417, 445, 40 S.Ct. 293, 64 L.Ed. 343; Tilbury v. Rogers, D.C., 123 F. Supp. 109, 114, affirmed Tilbury v. Mitchell, 5 Cir., per curiam, 220 F.2d 757; United States v. Standard Oil Co., D.C., 78 F.Supp. 850, affirmed 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371; Champion Spark Plug Co. v. Reich, 8 Cir., 121 F.2d 769, certiorari denied 314 U.S. 669, 62 S.Ct. 130, 86 L.Ed. 535; Gray v. University of Tennessee, 342 U.S. 517, 72 S.Ct. 432, 96 L.Ed. 540; Brown v. Board of Trustees, 5 Cir., 187 F.2d 20.