**UNITED STATES of America**

**v.**

**Mae LUCKY, Registrar of Voters of Ouachita Parish, Louisiana, the State of Louisiana, the Citizens Council of Ouachita Parish, Louisiana, et al.**

**Civ. A. No. 8366.**

United States District Court
W. D. Louisiana,
Monroe Division.
March 11, 1965.

---

**234**

Nicholas de B. Katzenbach, Atty. Gen.,
U. S. Dept. of Justice, John Doar, Asst.
Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Edward L. Shaheen, U. S. Atty., for Western Dist. of Louisiana, Shreveport, La., for the Government.

Jack P. F. Gremillion, Atty. Gen., and Harry J. Kron, Jr., Asst. Atty. Gen., State of Louisiana, Baton Rouge, La., Albin P. Lassiter, Dist. Atty., Ouachita Parish, Lovell E. Hayden III, Sholars, Gunby & Allbritton, Robert W. Kostelka, Monroe, La., W. M. Shaw, Shaw & Shaw, Homer, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

## FINDINGS OF FACT

1. This suit was filed by the Attorney General of the United States under the Civil Rights Act of 1957, as amended (42 U.S.C. § 1971). The complaint alleges that the defendants have engaged in acts and practices which have deprived Negro citizens of the right to register and vote in Ouachita Parish, Louisiana, without distinction of race or color.

2. Named as defendants are Mae Lucky, Registrar of Voters of Ouachita Parish, Louisiana; the State of Louisiana; the Citizens Council of Ouachita Parish, Louisiana; and eighteen individuals who allegedly conducted a purge of the voter registration rolls in the Spring of 1956.

3. Mae Lucky has been the Registrar of Voters of Ouachita Parish since January 2, 1953. As Registrar, her function is to receive applications for registration from prospective electors and to determine whether or not they are qualified to register to vote. Mrs. Lucky resides in and maintains her office at Monroe, Louisiana, in Ouachita Parish.

4. The Ouachita Parish Police Jury adopted the permanent registration system in 1952. · Under this system all persons registered to vote in Ouachita Parish at the end of 1952 were eligible for permanent registration without making further application and without taking qualification tests. During the period between January and July, 1953, the Registrar converted the Ouachita Parish voter registration records from periodic registration to the permanent registration system.

5. Prior to 1956 applicants for registration to vote in Ouachita Parish were not required to read or interpret any part of the State or United States Constitution or to take any other test of literacy, intelligence or knowledge. Many applicants for registration in Ouachita Parish were not required to fill

out their own application cards without assistance.

6. The Registrar maintains two files for the application cards of registered voters in Ouachita Parish. One file is for Negro voters and the other for white voters, and each file is an alphabetical list of voters by precinct and ward. These separate files are kept for the purpose of completing monthly and annual statistical reports to the Board of Registration of the State of Louisiana.

7. At the time of the Democratic Party primary election for State officers in January, 1956, there were 21,274 white voters and 4,518 Negro voters permanently registered in Ouachita Parish.

8. In February, 1956, the Registrar commenced a systematic inspection of all application cards on file of persons then registered to vote in Ouachita Parish. She went through her files precinct by precinct, beginning with Ward One, Precinct One. As a result of this examination the Registrar sent a letter to each voter she determined to be registered improperly, based on the laws of Louisiana in effect at that time. Each voter who received a letter was required to appear in person at the office of the Registrar and make out a new application card in order to remain on the registration rolls. Those who did not appear were removed from the active files in April, 1956. As a result of this systematic examination 888 white persons and 634 Negroes then were removed from the active voting rolls.

9. During April, 1956, a group of citizens came to the office of the Registrar and examined the application cards of persons then registered to vote in Ouachita Parish, and as a result they filed with the Registrar Affidavits of Challenge, challenging the registration status of persons then registered to vote on the ground that they were registered illegally. They also presented to the Registrar citations to be mailed to the challenged voters. In accordance with LSA–R.S. 18:133 (1950), the Registrar mailed these citations and a copy of the Affidavits of Challenge to the challenged voters, notifying them that they must appear before the Registrar within 10 days and prove their right to remain on the registration rolls by an affidavit signed by three registered voters. Notice of the challenges was also published in the Monroe newspaper. A total of 4,047 Negroes and 37 whites were challenged at this time by these citizens. From that group of challenged voters, 917 Negroes and 21 whites filed affidavits of retention and were retained on the rolls.

10. The Affidavits of Challenge were signed by the following defendants: Billye L. Adams, Felix E. Brossett, Wirt H. Dean, Rev. H. L. Driskell, John Feeback, Vaughn Phelps, Walter B. Reed, Aguilla G. Rivers, Jr., James C. Ussery, Wesley Burdine, Antham B. Johnston, Don L. Williams, Jimmie J. Evans, James W. Gibson, Algernon C. Ransom, and Tommy Thorp.

At this time Billye L. Adams was President of the Citizens Council of Ouachita Parish, and Vaughn L. Phelps was Secretary of that organization. While some of the other individuals made defendants were members of the Citizens Council, it does not appear that they acted as agents of the Citizens Council when they examined the voter rolls and prepared the affidavits of challenge. Their actions grew out of a citizens' meeting held early in 1956 with which the Citizens Council was in sympathy, but the Citizens Council took no official action to help issue the challenges and did not authorize any of the individual defendants to do so.

11. In response to these challenges, and those issued by the Registrar, great numbers of voters went to the Ouachita Parish Courthouse to file affidavits of retention. The lines of voters were so great that the Ouachita Parish Sheriff's Department had to hand out priority numbers to persons attempting to get into the Registrar's office. The Registrar was not able to process each day more than approximately 100 persons seeking reinstatement. Each voter seek-

ing to be retained on the rolls was required to file an affidavit of retention, and prior to May 1, 1956, due to a misunderstanding of Louisiana law, the Registrar would not accept an affidavit of retention unless it was signed by three persons who were registered to vote in the challenged voter's ward and precinct and whose registration status was not under challenge. In addition, prior to May 1, 1956, the Registrar would not permit a voter to sign an affidavit of retention for more than one challenged voter. This practice was ended after May 1, 1956. These requirements were applied alike to white and Negro voters.

12. In June, 1956, the Registrar commenced another systematic examination of all application cards on file of persons then registered to vote in Ouachita Parish. This continued from the Summer of 1956 until the Spring of 1957. The Registrar again went through the files precinct by precinct and examined the card of each white and Negro voter, and she then sent a letter of challenge to each voter she determined to be registered improperly. The names of these challenged voters were published in the *Monroe News Star*. These challenges were issued because of errors which the Registrar found on their registration application cards. If any error was found on a voter's card, that error was checked and a challenge issued, regardless of the race of that particular voter. During this period the Registrar issued letters of challenge to 8,499 white persons and to 1,157 Negroes.

13. Since January 1956, the Registrar has required all applicants for registration to fill out an application card without error or omission. If the Registrar determines that an applicant has made an error or an omission, his application for voter registration is rejected. Such applicant is required to complete another card in order to register. The applicant is given another opportunity at that time to complete correctly an application card. If he cannot do so, he must come at another time to make another application for registra-

tion. This practice was shown to be identical for white and Negro voters.

14. La.Const. (1921) Art. 8, § 1(c), L.S.A. provides that an applicant for registration must demonstrate his ability to read and write by filling out the application form in his own handwriting " * * * in the presence of the registration officer or his deputy, without assistance or suggestion from any person or any memorandum whatever, other than the form of application * * *." It is in compliance with this provision that the Registrar has adopted the requirements that the application card must be completed without errors or omissions.

15. Between January, 1957, and January, 1961, the Registrar periodically conducted systematic examinations of the application cards of persons then registered to vote in Ouachita Parish to determine whether there was any inconsistency between the address given by the voter on his application card and the information contained in various directories, such as the city directory or the telephone book. As a result of these examinations the Registrar sent letters of challenge to voters whose application cards showed an address inconsistent with that listed for the voter or showed an address listed in another person's name. These letters were sent to both white and Negro voters.

16. During the period from July, 1961, to the time of trial, the Registrar has required as a prerequisite to applying for registration that applicants establish their residence in Ouachita Parish by documentary proof. She has required voters to produce three documents which bear the applicant's name and which are dated to show that each is more than six months old but no older than two years. Each document must show an address in Ouachita Parish, and one must have the present address of the applicant. While these requirements are stringent, they have been applied equally to Negro and white applicants.

17. During the period from 1956 through August, 1962, the Registrar

gave a constitutional interpretation test to those who applied for voter registration. Applicants who were unable to interpret portions of the Louisiana and United States Constitutions were denied registration. This test was discontinued in September, 1962.

18. From September, 1962, through November, 1963, the Registrar required as a prerequisite to registration that applicants pass the citizenship test prescribed by the Board of Registration of the State of Louisiana by resolution dated August 2, 1962. The use of this test was discontinued in November, 1963, pursuant to United States v. Louisiana, 225 F.Supp. 353 (E.D.La.1963), affirmed 1965, 85 S.Ct. 817. As a result of the holding in that case, the Registrar has been enjoined from using either the constitutional interpretation test or the citizenship test. It is not necessary, therefore, that we consider injunctive relief against these tests here.

19. The total number of persons challenged by the Registrar for errors on their application cards, improper addresses, and other errors, including those challenged before and after the "purge" by the individual defendants, were 9,387 whites and 1,791 Negroes. In addition to these challenges, 4,047 Negroes and 37 whites were challenged by the individual defendants.

20. From 1956 through 1963 there were approximately 17,690 white applicants for registration, and 400, or about 2.26 percent, of these were rejected because of errors on their application cards. During this same period there were approximately 2,947 Negro applicants for registration, and 686, or about 23.2 percent, of them were rejected because of errors on their application cards.[1] While the percentage of Negro rejections for errors on application cards is higher than that of white rejections, the disproportion is not so great as it might seem at first blush. It is common knowledge that, although there were several school teachers among the Negro applicants, the educational level generally is much higher among most white applicants than it is among Negro applicants. It is to be expected that more errors would have been made by less educated persons when filling out application cards. It is also noteworthy that during trial of this case many Negro witnesses testified that they made application card errors on more than one occasion, and one witness, whose testimony was found to be almost incoherent, stated that she had made out more than twenty application cards. Repeated instances such as these make the total number of rejected Negroes appear higher than it actually is. Frequent errors on several application cards by numerous Negro applicants cause distortion of the total picture by making the percentage of Negro rejections appear higher.

21. A greater percentage of white applications during this period were rejected because of errors on their registration cards than were Negroes. Of the 668 whites rejected, 400 were rejected for errors on their cards, or 59.8 percent. Of the 1,435 Negroes rejected for all causes, 686 were rejected because of errors on their application cards, or 47.8 percent.

22. In Tables B through F of the Appendix to the Government's brief are listed the total number of whites who remained on the voter rolls on December 13, 1960, but who had one kind of error or another on their registration cards in April, 1956. In Table B are included some applicants who were put on the

---

[1]. These figures can be computed from Table H to the Appendix to the Government's brief. That table shows the monthly and annual rejections for the years 1956 to 1963 and the reasons for the rejections, whether for errors on the application form or for failing either the constitutional interpretation test or the citizenship test. Since both these tests have been discontinued under court order, we have deducted those rejected for failing one of the tests in order to get a clear picture of the rejections for the reason alleged to have been discriminatory—errors on the application cards.

rolls after 1956. We have deducted this number from the table in order to get a true picture of the status of the registration rolls at a particular time for purposes of comparison. After this number is deducted, the tables reveal the total number of whites who had errors on their application cards in 1956 but who had not been removed from the rolls by challenge in December, 1960. This number is 9,361 [2] out of a total white registration as of March, 1956, of 24,184, a percentage of 38.7.

By comparison, defendants showed that as of the date of the trial of this case in February, 1964, there were 325 Negroes remaining on the registration rolls who had errors on their application cards. The total Negro registration at that time was 1,342. Therefore, 24.2 percent of the Negroes registered to vote in February, 1964, had errors on their application cards.

In further comparison, we note that the Government's Table B shows that 4,188 of the 24,184 whites registered in 1956 who had age miscomputations on their application cards remained on the rolls in 1960, or 16.9 percent. Of the 1342 Negroes on the rolls at the time of the trial, 147 had miscomputed their ages on their application cards, or 10.9 percent.

■ 23. We think these figures, together with the testimony of the witnesses, both white and Negro, which we have carefully reviewed, show that the Registrar has not discriminated against Negroes either in her challenging procedure or in her rejection of application cards because of the appearance of errors. Moreover, we were quite impressed with the demeanor of Mrs. Lucky and her assistant, Mrs. Morin, during their testimony, for they impressed us as completely honest persons perfectly willing to tell the truth. While the Registrar's requirements were strict, they have been applied equally and in the same manner to members of both races.

24. The Government called a total of 63 Negro witnesses to testify in its attempt to show racial discrimination. At least 41 of these witnesses, at the time of the trial, were registered to vote, and many of them have been registered continuously since 1949. Several of those who were not registered at the time of trial showed little or no interest in registering to vote, since they had not bothered to re-apply for several years after having been rejected.

CONCLUSIONS OF LAW.

1. This Court has jurisdiction of this action under 42 U.S.C. § 1971(d) and under 28 U.S.C. § 1345.

2. The Attorney General is authorized to institute this action on behalf of the United States under 42 U.S.C. § 1971(c) to obtain relief against acts and practices by the defendants which would deprive other persons of rights and privileges secured by 42 U.S.C. § 1971(a).

■ 3. The State of Louisiana is properly joined as a party defendant pursuant to Section 601(b) of the Civil Rights Act of 1960, 42 U.S.C. § 1971 (c).

■ 4. Acts and practices of the Registrar which violate 42 U.S.C. § 1971 (a) are also the acts and practices of the State. (Civil Rights Act of 1960, Sec. 601(b)).

5. 42 U.S.C. § 1971(a) forbids any distinctions in the voting process, including registration for voting, based upon race or color.

6. The evidence does not show that the Registrar's examination of the registration rolls in February, 1956, and the challenges which she issued to 888 whites and 634 Negroes as a result of her examination was racially discriminatory in violation of 42 U.S.C. § 1971(a) and the Fourteenth and Fifteenth Amendments to the United States Constitution.

2. This number is reached by taking the total of 5,761 in Table B and deducting from it the applicants who registered after 1956, a total of 1,573. To the balance of 4,188 is added the totals from Tables C through F.

The same standards were used in issuing challenges to both white and Negro voters.

7. The evidence fails to show that the Registrar's examination of the registration rolls from June, 1956, through the Spring of 1957 and the challenges issued as a result of that examination were racially discriminatory in violation of 42 U.S.C. § 1971(a) and the Fourteenth and Fifteenth Amendments. Identical standards were used in issuing challenges to both white and Negro voters.

8. No racial discrimination has been shown on the part of the Registrar in her periodic examination of the voter registration rolls between January, 1957, and the present. Throughout this period the Registrar has enforced strictly the laws of Louisiana pertaining to the completion of the application forms, but these laws have been enforced with equal strictness against whites and Negroes.

9. The Government has failed to show that the Registrar has used more stringent procedures and standards for Negro applicants than for white applicants in conducting the reinstatement of voters who had been challenged and the reregistration of those removed from the rolls during the period from 1956 until the trial of this suit. Nor has it been shown that the Registrar has discriminated against applicants on the basis of race or color in rejecting the applications of those who make errors and leave omissions in filling out the application form for registration. In rejecting these applications for errors or omissions she has applied the same standards to whites and Negroes.

This Court has not hesitated, in appropriate cases, to issue injunctions against Registrars of Voters because of unlawful discrimination. See, e. g., United States v. Ass'n of Citizens Councils, et al., D.C., 196 F.Supp. 908; United States v. Manning, Registrar, D. C., 205 F.Supp. 172; United States v. Ward, Registrar, D.C., 222 F.Supp. 617; United States v. Wilder, Registrar, D.C.,

222 F.Supp. 749; United States v. Crawford, Registrar, D.C., 229 F.Supp. 898; and United States v. Clement, Registrar, D.C., 231 F.Supp. 913. Here, however, we must find on this record that Mae Lucky has administered her duties evenhandedly, without purposeful discrimination against Negroes in any respect.

■ 10. The individuals named defendants who challenged the registration status of Negro voters in Ouachita Parish in April, 1956, engaged in acts and practices under color of law which were racially discriminatory in purpose and effect in violation of 42 U.S.C. § 1971 (a) and the Fourteeenth and Fifteenth Amendments to the United States Constitution.

■ 11. While such individual defendants have engaged in racially discriminatory acts under color of law, it is shown that they voluntarily discontinued those acts and have not resumed them for almost nine years. We think this prolonged discontinuance shows intention to comply with the law and not to resume their wrongful acts. Therefore, the injunction prayed for against the individual defendants will be denied at this time. Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945); Sharp v. Lucky, D.C., 165 F.Supp. 405 (W.D. La.1958) and cases cited therein. Nevertheless, we will retain jurisdiction over the individual defendants in the event they renew their unlawful activity. See United States v. Association of Citizens Councils of Louisiana, 196 F.Supp. 908 (W.D.La.1961).

12. This Court has held that, where there was a mass challenge of Negroes on the basis of race, those illegally challenged should be reinstated to the voter registration rolls. United States v. Wilder, 222 F.Supp. 749 (W.D.La.1963); United States v. Ass'n of Citizens Councils, 196 F.Supp. 908, 911 (W.D.La., 1961). See also United States v. Thomas, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535 (1960); United States v. McElveen, 180 F.Supp. 10 (E.D.La.1960). How-

ever, in those cases the mass challenges only had effect against the members of the Negro race. Here the challenges instituted by the individual defendants and those made by the Registrar, all of which charged that voters were registered illegally on the basis of the same general types of errors or omissions on their voter application cards, had equal effect against both white and Negro citizens. In fact, the total number of whites challenged during the period covered by this suit was much greater than the number of Negroes challenged during the same period. It would be highly inequitable here to order reinstatement of the challenged Negro citizens without also providing for reinstatement of the challenged white citizens. Since there has been no showing that the Registrar has discriminated against Negroes in the re-registration of challenged voters, and since the effect of the mass challenges against the white citizenry has been at least equal to the effect against Negro citizens, no need exists for the use of our equity powers in ordering reinstatement of the challenged Negro voters.

13. We already have mentioned that any discrimination that may have existed previously on the part of the Registrar in the administration of the constitutional interpretation test or the citizenship test has been halted by the decision rendered by the Eastern District of Louisiana in United States v. Louisiana, 225 F.Supp. 353 (E.D.La.1963), affirmed 1965, 85 S.Ct. 817, 13 L.Ed.2d 709. Since no need for injunctive relief against the use of these tests remains, plaintiff's demand in that regard is rejected.

14. The evidence failed to prove that the individual defendants acted as agents of the Citizens Council of Ouachita Parish in conducting their mass challenge of Negro voters in April, 1956. Therefore, plaintiff's action against the Citizens Council of Ouachita Parish is dismissed.

15. Because of our ruling on the merits of this case, we find it unnecessary to rule on the motion to dismiss filed by the individual defendants on the grounds that plaintiff failed to comply with the Court's order to produce documents. However, we note in passing that plaintiff substantially complied with the Court's order.

16. For the foregoing reasons the injunctive relief prayed for by plaintiff against Mae Lucky, Registrar of Voters of Ouachita Parish, and against the State of Louisiana, the Citizens Council of Ouachita Parish and all the individuals named defendants is denied. Jurisdiction over the individual defendants is retained for the purpose previously stated.